**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ricky Lee SANDS,**
**Defendant–Appellant.**

No. 88–2514.

United States Court of Appeals,
Tenth Circuit.

March 26, 1990.

Stephen J. Greubel, Asst. Federal Public Defender, Tulsa, Okl., for defendant-appellant.

Sheldon J. Sperling, Asst. U.S. Atty., Muskogee, Okl. (Roger Hilfiger, U.S. Atty.,

with him on the brief), for plaintiff-appellee.

Before McKAY, SEYMOUR, and MOORE, Circuit Judges.

SEYMOUR, Circuit Judge.

After a jury trial, Ricky Lee Sands, a Native American Indian, was convicted in the United States District Court for the Eastern District of Oklahoma of murder in the first degree in violation of 18 U.S.C. § 1153 (1988) and 18 U.S.C. § 1111 (1988).[1] Sands filed a motion for a new trial in which he contended that he was denied a fair trial by the admission of prejudicial evidence. The district court denied the motion. We reverse.

On the evening of December 12, 1987, Sands shot and killed John Mauldin on Indian land. For several hours prior to the shooting, Sands, Mauldin, and four of Sands' cousins had been "riding around" in Mauldin's car. *See* rec., vol. II, at 26. During this time, Sands drank a considerable quantity of beer and some rum.[2] Sands' three female cousins shared a small amount of the beer, but Mauldin did not drink anything. *Id.* at 17, 126, and 234–35. At one point during the evening, Sands, who was in the front passenger seat, suddenly pulled out a gun, pointed it at Mauldin's head, and "clicked it." *Id.* at 27, 96, and 240.[3] Sands then attempted to apologize to Mauldin, but Mauldin refused to accept his apology and told him that they would fight when "[w]e get to the house." *Id.* at 120; *see also id.* at 61, 216, and 251.

Shortly after this conversation, as the car slowed down and pulled into the driveway of two of the passengers, Sands pulled out a gun and shot Mauldin first on his right side and then, as Mauldin opened the door and started to roll out, in his back. Sands ordered one of the passengers to start driving the car away. When it stalled, Sands got out of the car and walked around to the back where Mauldin lay. Testimony indicated that Sands kicked Mauldin in the face and shot him three or four more times. *Id.* at 40.

Before the start of the first trial, the district court granted Sands' Motion in Limine to prevent the Government from introducing evidence of his prior convictions, as long as Sands himself did not testify. That trial ultimately ended in a mistrial when the jury was unable to agree upon a verdict after a day and a half. The jury told the court that it was divided on the issue of premeditation.[4]

A second trial then began. Sands stipulated at the beginning of the trial that he shot and killed John Mauldin. Rec., vol. II, at 4. Sands' defense was that the homicide was not premeditated but was instead the product of self-defense or, at most, voluntary manslaughter.

The issue of Sands' prior criminal convictions arose, and the Government agreed to advise its witnesses not to "mention the fact that the defendant had been in the penitentiary." Rec., vol. III, at 325. It was during this second trial that the allegedly prejudical material came in. The first

---

1. Defendant also pled guilty to possession by a convicted felon of a firearm which had previously been transported in interstate commerce in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(1)(B) (1988). This is not at issue on appeal.

2. Just how much beer Sands drank is very unclear from the record. There is testimony that he had been drinking that afternoon, *id.* at 81, and when the five people drove to a store to buy beer, he bought anywhere from twelve to thirty-six cans of beer. *Id.* at 17 and 217.

3. The *dissent* contends that while pointing the gun at Mauldin's head, Sands threatened to kill both the victim and the others in the car. Only one of the four witnesses so testified, however.

Barbara Sands' testimony completely contradicts the other evidence of threats:

"Q: When he clicked it what, if anything, did Ricky Sands say to John Mauldin?
A: He didn't say anything to him. He just held it on his head.

. . . .

Q. Was there any conversation between … the two of them about this incident?
A. No, not at that time."
Rec., vol. II, at 28.

4. The jury was instructed on first degree murder, and on the lesser included offenses of second degree murder, and voluntary manslaughter. The jury also was instructed that voluntary intoxication may negate the existence of a specific intent.

statement at issue here was made by Irene Sands, one of Sands' cousins, in response to a question from the Government:

"Q: All right. During that time that you have known Ricky Sands, where has he lived most of the time?

"A: He lived around Okfuskee County for awhile [sic], and went to Tulsa, *been to prison*, Broken Arrow."

Rec., vol. III, at 310 (emphasis added). At the close of Irene Sands' testimony, Sands moved for a mistrial. *Id.* at 324.

The court's initial response to the statement was one of shock:

"I don't even understand the purpose of the question. Why did you ask the question? ... [H]ad you talked with ... your witnesses and told them they could not ever mention the fact that the defendant had been in penitentiary?

. . . .

I heard [the answer]. I almost fell through the floor. I couldn't believe that that—here we are in the second trial, and that you take a chance by asking that question."

*Id.* at 325–26. Nevertheless, the judge stated that "the fact that the defendant has been to the penitentiary does not, in my mind, affect his intent," *id.* at 339, and he denied the motion. In making its ruling, the court also concluded that the prosecutor had not purposely elicited the specific response, that the answer had been "vague and passing in nature," and that the evidence up to that point had been "overwhelming." *Id.* Sands then declined the court's offer to give the jury a cautionary instruction.

The problems with this inadmissible information continued with the very next witness, Ed Smith, an Under Sheriff in Okfuskee County. Smith began to discuss Sands' criminal record when he was cut off by Sheldon Sperling, the Government attorney:

"Q: As best you recall that conversation tell the Court and jury what it briefly involved.

"A: Well, he had been recently released out of—

"Mr. Sperling: Just a minute. Just a minute."

*Id.* at 357. Again Sands made a motion for a mistrial. The court asked Mr. Sperling whether he had told the witness not to refer to any prior criminal convictions. Mr. Sperling responded that he had, but that he could not recall exactly when he did so. *Id.* at 358. The court observed that the witness had been cut off before saying anything, and denied the mistrial motion. The jury was instructed on first degree murder, second degree murder, and voluntary manslaughter. It took five hours to find Sands guilty of first degree murder.

Sands argues that the district court erred by denying his motions for mistrial and for a new trial. Specifically, Sands contends that a new trial is required because it is not possible to "say with reasonable certainty that the reference to prior records 'had but very slight effect on the verdict of the jury.'" *Sumrall v. United States,* 360 F.2d 311, 314 (10th Cir.1966); *see also Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946); *United States v. Walton,* 552 F.2d 1354, 1366 (10th Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977) (standard is whether the statement could "have had any appreciable effect on the action of the jury"); *United States v. Woodring,* 446 F.2d 733, 737 (10th Cir.1971) (same). In response, the Government argues that because Sands did not seek a cautionary instruction and because evidence of his guilt was so strong, a new trial is not required. We disagree with the Government.

In support of its position, the Government cites *United States v. Heath,* 580 F.2d 1011 (10th Cir.1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979). There a non-examining attorney allegedly coached a witness on the stand. We held that it

"would have been best to strike the remark made as fully irrelevant and to admonish the jury to ignore it.... [A] belated motion for a mistrial is not the accepted procedure in this Circuit following such an incident."

*Id.* at 1018; *see also United States v. Eaton*, 485 F.2d 102, 107–08 (10th Cir.1973) (the proper procedure required in this circuit is to make a motion to strike, admonish the jury, and warn the witnesses not to volunteer prejudicial remarks).

This case differs from *Heath* and *Eaton* in several respects. First, the motions for mistrial made here were not "belated" as in *Heath;* the initial motion was made just after Irene Sands' testimony, and the later one immediately after the next witness uttered the "released out of—" statement. Second, in *Heath* we emphasized that the trial court there "did not regard [the incident at issue] as important" and that "there was no prosecutorial misconduct." *Heath*, 580 F.2d at 1017. Here, by contrast, the trial judge stated that when he heard Irene Sands refer to defendant's prison time, he "almost fell through the floor," rec., vol. III, at 326, and he added that "I don't see how it can be cured." *Id.* at 329. Additionally, while the Government's conduct in this case may not rise to the level of "misconduct," it certainly borders on negligence. As the trial court noted:

> "[Y]ou [the Government attorney] just didn't give it enough thought, didn't think out what you were going to do, ... didn't prepare your case well enough, didn't think about what you were going to ask and the ... kind of answer that it might bring."

*Id.* at 327.

Finally, the Government's stress on the fact that Sands did not want a cautionary instruction is somewhat disingenuous since the Government itself recognized that "[s]ometimes the defense would chose [sic] not to request anything so as not to emphasize [the reference to defendant's record]." *Id.* at 326. A cautionary instruction is generally preferred, but we do not wish to prevent a defendant's defense counsel from making a tactical decision that such an instruction would do "more damage than good." *Id.* at 339. We recognized in *Maestas v. United States*, 341 F.2d 493, 496

(10th Cir.1965), that a cautionary instruction is not sufficient to cure the error where the error is likely to make a sufficiently strong impression on the jury that it will be unable to disregard it. *See also United States v. Murray*, 784 F.2d 188, 189 (6th Cir.1986) (cautionary instruction under such circumstances is "very close to an instruction to unring a bell").

The Government also contends that where "the sheer volume of evidence against the defendant was so great as to make insignificant an isolated comment that he had been in prison before, the defendant has suffered no significant prejudice" that would warrant a new trial. Government Brief at 10. As we observed in *Sumrall:*

> "[T]he question is not whether the appellants have been proven guilty, but whether guilt was established according to the procedural safeguards to insure trial before a fair and unprejudiced jury.... The question we must decide is whether the jury was more prone to convict these appellants knowing they had previous records than without such knowledge."

360 F.2d at 314. In assessing this question, it is significant that the issue in this case is not whether Sands killed Mauldin, since he conceded that point, but what his state of mind was. We cannot agree with the district court's conclusion that the evidence of intent was "overwhelming" and that the references to Sands' past incarceration were so "vague and passing in nature" that they did not make the jury more prone to convict him of first degree murder. In fact, the evidence that Sands killed *with premeditation and malice aforethought* was not overwhelming. Contrary evidence as to his state of mind included the great quantity of alcohol he had consumed and Mauldin's threats of a fight. Several witnesses testified that Mauldin had a hunting gun in the backseat of the car, rec., vol. II, at 40–41, 117, and 212, and that Sands was present at a fight in which Mauldin had beaten up his opponent.[5] *Id.*

---

**5.** We do not pass judgment on the weight or accuracy of this evidence. We merely note that

a jury uninfluenced by improper information might have found this evidence in the record

at 126–27. This evidence, combined with the fact that the jury in the first trial could not agree upon the issue of premeditation, and that the second jury took five hours to reach its decision on Sands' intent, prevent us from saying "with reasonable certainty that the reference to prior records 'had but very slight effect on the verdict of the jury.'" *Sumrall*, 360 F.2d at 314.

We conclude that the district court erred in denying Sands' motions for mistrial, and we reverse and remand for a new trial.

JOHN P. MOORE, Circuit Judge, dissenting:

I must respectfully dissent because I believe with reasonable certainty that the verdict of the jury was not affected by references to the defendant's prior record. I disagree with the court's analysis for two reasons. First, in my view, the testimony of Sheriff Smith was not a reference to the defendant's prior record. Second, I cannot concur in the suggestion that the inability of the first jury to reach a verdict can be used in accessing the effect of the questioned remarks on the jury in this case.

The basis for the court's reversal lies within statements made by two witnesses. Irene Sands volunteered the defendant had "been to prison."[1] Even accepting that the jury might have fixed upon this statement within the context in which it was made, it stands as the only reference to defendant's prior incarceration.

The second statement upon which the court focuses is that of Sheriff Smith who offered the incomplete statement: "Well, he [the defendant] had been recently out of ----." The court describes this statement as an attempt by Mr. Smith to discuss the defendant's criminal record, but the remark is incomplete and therefore ambiguous. Taken in or out of context, the statement in no way refers to a prior conviction. We have no way of knowing what Mr. Smith meant, and, perforce, neither did the jury. To say, then, that this remark could have influenced the jury is conjecture.

As a consequence, we are left with only Ms. Sands' testimony that her cousin had been "to prison." We must weigh this statement against the evidence of guilt proffered by the prosecution to determine whether the volunteered remark could have influenced the outcome of this case. When the record is viewed in this light, I can find no reason to believe Ms. Sands' revelation of the defendant's prior incarceration had *any* effect on the jury.

There is an abundance of testimony that supports the verdict. First, evidence shows that the defendant, without provocation, pointed his gun at his victim's head and "clicked" the trigger while threatening to kill the victim and the others in the car. (R. Vol. II, at 95). Second, the initial shooting of the victim, once in his side and once in his back, was without warning or provocation. Third, Sands got out of the car and pointed his pistol at Barbara Sands, his cousin, and asked if she was "going to tell." (R. Vol. II, at 38). Defendant then turned to his victim, kicked him in the face, and fired three more shots point blank into his head and body. *Id.* at 39–40. In light of this evidence, I cannot believe the jury was influenced by Ms. Sands' remark the defendant had "been to prison."

Further, I can see no logic in drawing inferences from the inability of the first jury to reach a verdict. It seems patent to me that what may have influenced or failed to have influenced that jury is irrelevant. Even if the evidence presented to both ju-

sufficient to negate the existence of the intent needed for first-degree murder.

1. This testimony came in without objection or interruption. It was not until some time after completion of cross-examination that defense counsel sought a mistrial on the basis of this statement. The prosecutor responded that the remark was a "surprise and shock" to him and that he was merely attempting to establish "her familiarity with the defendant." Taken in context, the question which prompted the response

bears out that representation. The prosecutor asked Ms. Sands how long she had known the defendant and then asked where he had lived during that time. After the responding remark, the prosecutor asked whether the defendant had lived in the vicinity of Ms. Sands' house. (R. Vol. III, at 310). The context shows the purpose of the questions was to fix the nature and duration of Ms. Sands' familiarity with the defendant.

ries was identical—which we do not know—the collective reaction of that body of people cannot be utilized to surmise the collective reaction of a completely different group of souls. We must judge the effect of the volunteered testimony only upon the jury which rendered the verdict. To do otherwise is neither just nor logical. I would affirm.