PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 13 2004**

**PATRICK FISHER**
**Clerk**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JAMES EARL MERIDYTH,

      Defendant-Appellant.

No. 03-2079

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. CR-00-557-LH)**

---

Submitted on the Briefs: [*]

Steven A. Harrell, Albuquerque, New Mexico for Defendant - Appellant.

David C. Iglesias, United States Attorney and Laura Fashing, Assistant United States Attorney, Office of the United States Attorney, Albuquerque, New Mexico for Plaintiff - Appellee.

---

Before **HENRY** , **BARRETT** , and **TYMKOVICH** , Circuit Judges.

---

**TYMKOVICH** , Circuit Judge.

---

[*] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

Defendant-Appellant James Earl Meridyth appeals the district court's denial of his motion for mistrial. Specifically, Meridyth claims the court abused its discretion by not declaring a mistrial after a prosecution witness testified that he had moved because he felt his life was in danger. Exercising jurisdiction pursuant to 28 U.S.C. §1291 and finding no abuse of discretion, we affirm.

I.

Following a multi-jurisdictional sting operation in Las Cruces, New Mexico, James Meridyth was tried and convicted of three counts of violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846 of the federal narcotics trafficking laws. At trial, the prosecution introduced testimony from an undercover police officer and a confidential informant detailing three transactions in 1999 and 2000 in which Meridyth sold them over 600 grams of cocaine. [1] Other law enforcement officers who had conducted surveillance of the three transactions corroborated this testimony. In addition, Meridyth's brother Ronnie testified about his and his brother's drug sales in general, and particularly their participation in the August 1999 transaction.

---

[1] The crimes for which Meridyth was indicted and convicted related only to the first two transactions, which took place on August 13, 1999, and September 2, 1999. The August sale involved approximately 237 grams of crack cocaine, and the September sale 216 grams of powder cocaine. The third transaction took place on January 27, 2000, and involved around 238 grams of powder cocaine.

Meridyth moved for a mistrial after a brief exchange during the government's direct examination of the confidential informant, Michael Williams. Williams had acted as an informant in approximately forty to fifty cases for a variety of law enforcement agencies. The Assistant U.S. Attorney asked Williams a series of questions about the various payments he had received for his work on those cases, eventually leading to a discussion about Williams's decision to move from Carlsbad, New Mexico, in late 1999 or early 2000. Williams testified that he was paid around $1000 by the U.S. Attorneys Office for that move. The prosecutor then asked, "Why did you leave Carlsbad?" Williams responded, "Because I felt my life was in danger, and I was being threatened at that time." Supp. App. at 334.

Defense counsel for Meridyth and his co-defendant Edward Oliver immediately objected and moved for a mistrial. The defense argued to the district court, as here, that Williams's statement could lead the jury to believe it was Meridyth or his co-defendant who had threatened Williams, a proposition for which there was no evidence in the record. [2] After extensively discussing the

---

[2] In fact, during the ensuing bench conference, the prosecutor tried mightily to convince the court that certain statements made by Meridyth and his associates were at least partly responsible for Williams's fear. *See* Supp. App. at 335-56. The prosecution did not attempt to introduce such threats into evidence, however.

matter with counsel at a sidebar conference outside the hearing of the jury, the district court denied the motion.

The court did, however, give the following limiting instruction to the jury:

> After an exhaustive discussion with counsel and my own examination of this witness out of your hearing, I have determined a couple of things.
>
> First, it appears that the United States Attorney asked the question regarding why this witness moved to, in part, explain why the United States Government, through the United States Attorney's Office, has provided $1000 in assistance for this individual to move. You will recall that the witness said he moved because of threats made against him.
>
> In part, an inference that you could draw from that statement was that the threats were made by Mr. Oliver and Mr. Meridyth. I am telling you now that that would be an improper inference, based on all of the information I now know. You will recall that this witness was working on at least 40 cases with the drug task force. That gives this witness ample opportunity to make a lot of enemies.
>
> While I have no reason to doubt that – the likelihood that what motivated him to move were threats, it can't be said, based on any credible evidence now known to the Court that those threats can be connected to these defendants. And you may not infer that they do, based on the evidence we now have.

Supp. App. at 360-61. The court then proceeded with the case, and the jury returned guilty verdicts against Meridyth and his co-defendant.

## II.

We review a district court's refusal to grant a mistrial for abuse of discretion. *United States v. Kravchuk*, 335 F.3d 1147, 1154 (10th Cir. 2003). The district court has discretion to grant a mistrial only when a defendant's right to a fair and impartial trial has been impaired. *Id.* at 1155. *See also United States*

*v. Laymon* , 621 F.2d 1051, 1053 (10th Cir. 1980) ("Whether a motion for mistrial should be granted is within the discretion of the trial judge because he is in the best position to evaluate the effect of the offending evidence on the jury.") "While the Federal Rules of Criminal Procedure offer little guidance on when judges should grant mistrial motions, we have focused on whether [the defendant's] right to a fair and impartial trial was impaired. . . . [M]otions for mistrial . . . call for an examination of the prejudicial impact of an error or errors when viewed in the context of an entire case." *United States v. Gabaldon* , 91 F.3d 91, 93-94 (10th Cir. 1996) (internal quotations and citations omitted).

Though Meridyth has not styled his complaint as one of prosecutorial misconduct, in a case such as this, where the prosecutor asked a question her witness answered in a potentially improper way, a similar analysis is appropriate. The relevant factors in this analysis include (1) whether the prosecutor acted in bad faith, (2) whether the district court limited the effect of the improper statement through its instructions to the jury, and (3) whether the improper remark was inconsequential in light of the other evidence of the defendant's guilt. *See Kravchuk* , 335 F.3d at 1154-55. [3]

_____

[3] In *Zuern v. Tate* , 336 F.3d 478, 485 (6th Cir. 2003), the Sixth Circuit laid out five factors, including those above, but added inquiries into whether the improper remark was solicited by the government and whether the government's line of questioning was reasonable. These additional inquiries seem to us to be

(continued...)

Meridyth contends that the prosecutor knowingly solicited the response she got, that the court's admonition was insufficient to "remove the taint" of "the horror of drug-related violence" that Williams's statement would have planted in the minds of the jury, and that a jury with that "indelible" image on its minds could not give him a fair trial. He therefore says it was an abuse of the court's discretion not to declare a mistrial.

The government counters that the prosecutor's question was not intended to elicit improper testimony, but simply to explain why the U.S. Attorney's office had paid Williams $1000. In any case, the government says, the prosecutor did have information that Meridyth had threatened Williams, so there was nothing improper in Williams's testimony. Furthermore, the court's admonition and the other evidence should remove any worry that the jurors improperly convicted Meridyth because they thought he had threatened Williams.

As noted above, although much of the bench conference turned on whether a few statements made by Meridyth could be interpreted as threats to Williams, the government does not point us to any evidence it introduced to the jury – either before or after the statement in question – that supported such an interpretation.

---

[3](...continued)
helpful, but also subsumed within the "bad faith" factor.

The prosecutor's private knowledge about some allegedly threatening remarks cannot serve as the justification for eliciting otherwise improper testimony.

Nor is it quite correct to say the prosecutor did not intentionally elicit the statement in question, even if she arguably did so for a proper purpose. The prosecutor likely knew that Williams would testify that he moved out of fear for his safety. The government contends that the intent was merely to rebut any inference that they had paid Williams to testify favorably, not to imply that the defendants were responsible for that fear. Even this ostensibly innocent explanation is somewhat belied, however, by the prosecutor's response to the motion for a mistrial, which focused mainly on trying to convince the judge that the defendants had in fact threatened Williams. Still, the line of questioning did give the jury legitimate information germane to their consideration of Williams's credibility, and does not appear to be a gratuitous attempt to improperly influence the jury.

Nonetheless, the district court was correct to acknowledge that left unchecked, Williams's statement also could have led to a mistaken inference that Meridyth was threatening Williams's life. Though Meridyth's brief perhaps overstates the horror ordinary citizens sitting on a jury might feel about drug dealers threatening each others' lives, it is also true that such an inference might lead some jurors to consider evidence and crimes outside the record.

Importantly, however, Williams's statement was not left unchecked. As detailed above, the district court took great pains to instruct the jury not to infer that Meridyth (or his co-defendant) had threatened Williams. Jurors are presumed to follow their instructions, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000), and doing so in this case would preclude the improper inference alleged by Meridyth.

In addition, the likelihood of jurors making such an inference seems to us rather slim in the context of the trial. As the district court emphasized to the jury, Williams had been an informant in at least 40 other drug cases, which gave him "ample opportunity to make a lot of enemies." Williams made his statement in the midst of the prosecutor's inquiries into the remuneration he had received as an informant, not during any kind of testimony about Meridyth's behavior. A thoughtful juror could also note that Williams continued to do business with Meridyth even during the late 1999-early 2000 period when he said the threats forced him to move. Given this context, there is only the "slightest possibility" that a juror would allow Williams's statement to overcome otherwise reasonable doubt about Meridyth's guilt. *See United States v. Torres*, 959 F.2d 858, 860 (10th Cir. 1992) (quoting *United States v. Pinelli*, 890 F.2d 1461, 1473 (10th Cir. 1989)).

This conclusion is bolstered by the other evidence against Meridyth. In addition to Williams, the government produced testimony from undercover

Officer Paz, surveillance officers, and from Meridyth's own brother. All of these people offered direct testimony detailing Meridyth's sales of cocaine. Meridyth offers us no basis to think that to convict him a reasonable jury would have relied on a tenuous inference from Williams's remark, which it had been specifically and clearly instructed not to make, rather than on this powerful evidence of his guilt.

The district court therefore was well within its discretion in deciding that in the overall context of the trial, including particularly the court's admonition to the jury, Williams's statement posed no threat to Meridyth's right to a fair and impartial trial. Judgment AFFIRMED.