**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 16, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

RICARDO MARCELLUS
ANTHONY,

    Defendant - Appellant.

No. 04-2134
(D. New Mexico)
(D.Ct. No. CR-03-1447-BB)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges.

Ricardo Anthony was convicted after a jury trial of conspiracy to possess

with intent to distribute 500 grams and more of cocaine and possession with

intent to distribute 500 grams and more of cocaine. During trial testimony, one of

the government's main witnesses, co-defendant Tawnily Henderson, referenced

Anthony's pretrial detention. Anthony moved for a mistrial; the district court

---

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

denied the motion. Anthony appeals this denial. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I. Factual Background

In 2000 or 2001, Anthony and Henderson met while both were employed at Unity Health Care in Washington, D.C. In December 2002, Henderson was fired based on a disagreement with her supervisor. After losing her job, Henderson remained in phone contact with Anthony. In June 2003, Henderson and Anthony met by chance in person.[2] They discussed taking a trip together and eventually decided to travel to California. According to Henderson, Anthony told her "he was going to take care of some business" while in California. (R. Vol. V at 58.) On July 18, 2003, Anthony and Henderson wired $751 from a Western Union to a Roland Morris, Anthony's alleged travel agent, for the purchase of two one-way airline tickets from Washington, D.C., to California. Although she completed the wire transfer form, Henderson testified Anthony paid for the tickets.

The next afternoon, July 19, Henderson and Anthony flew to California. Henderson brought a backpack filled with a few clothes and $10-$20; Anthony brought a black suitcase. Once in Los Angeles, Anthony's friend, referred to as "D" or "G" (hereinafter referred to as D), picked them up from the airport and

---

[2] At this time, Henderson was a twenty-one-year-old unemployed single mother of a six-year-old boy and lived with her mother in Maryland.

drove them to their hotel. Henderson registered for the room.[3] According to

Henderson, Anthony gave her money to pay for the room. That evening, Anthony,

Henderson and D smoked marijuana in their hotel room. Later, after D left,

Anthony and Henderson ordered room service, which Anthony also paid for.

The next morning, July 20, D arrived at the room. Anthony told Henderson

he and D were going to "hang out" and he would be back shortly. (*Id.* at 71.)

Anthony provided Henderson with a telephone number where she could reach

him. After several hours passed without Anthony returning, Henderson called

him.[4] Anthony asked her to call Amtrak to see how much it would cost to return

to Washington, D.C., by train. Henderson did as requested. Later, Anthony and

D returned to the room. D had two bags, a white bag under his arm and a little

black bag in his hand. According to Henderson, she never saw what happened to

the bags because she went to take a shower and D left soon after she finished.

After D left, Anthony informed Henderson he had to get back to his job and

girlfriend in Washington, D.C. He asked her whether she would mind taking the

---

[3] The hotel clerk registered Henderson under her middle and last name. Henderson testified she was not attempting to hide her identity; rather, she stated she had provided her driver's license to the clerk and the clerk apparently copied her middle rather than first name.

[4] Henderson admitted at trial to making "a lot" of phone calls while at the hotel. (R. Vol. V at 128.) She stated she called people in Washington D.C. attempting to sell some tickets she had to an event back home. She denied any calls were in reference to a drug deal.

train while he flew back. After a brief argument, Anthony and Henderson agreed they would both take the three-day train ride back to Washington, D.C. That evening, they went to the train station with Henderson's backpack and Anthony's black suitcase. After getting their tickets (which Anthony allegedly paid for) and while waiting for the train, Anthony told Henderson, "If anything happened to me or anything happens, just -- you've got to let me know that you'll be 100 percent responsible for this bag [referring to his black suitcase]." (*Id.* at 83.) Henderson told Anthony she was not responsible for his suitcase.

Upon boarding the train, Henderson placed her backpack and Anthony's suitcase in the overheard compartment directly above their seats. According to Henderson, Anthony moved the bags and placed them in an overhead compartment across the aisle from them. During the train trip from Los Angeles to Albuquerque, New Mexico, Henderson partially unzipped Anthony's suitcase and pulled out a long-sleeved shirt which she put on. Later, Henderson reached into the suitcase a second time, this time to retrieve a pair of socks because her feet were cold.

The next day, July 21, the train stopped at the Albuquerque train station. Anthony de-boarded the train and was approached by Darrell Perry, a special agent with the Drug Enforcement Administration (DEA). Agent Perry identified himself as a police officer and asked Anthony for permission to speak with him.

-4-

Anthony agreed and Agent Perry asked him about his travel plans. Anthony informed Agent Perry he was traveling from California to Chicago to Washington, D.C. Agent Perry asked to see his train ticket; the ticket was issued to Ricardo Anthony and confirmed Anthony's statements concerning his travel. The ticket also indicated it had been paid for in cash ($314). Agent Perry requested identification; Anthony produced his driver's licence and it was returned. Agent Perry then inquired as to whether Anthony lived in Washington, D.C., and the purpose of his trip to California. Anthony informed Agent Perry he lived in Washington, D.C., that he had been in California "for vacation" and had stayed "for a couple of days." (*Id.* at 209.) Agent Perry then questioned whether he had any luggage with him; Anthony said no.

Subsequently, Henderson approached Agent Perry and Anthony. Agent Perry again identified himself as a police office and received her permission to talk with her. He asked to see her ticket; Anthony retrieved her ticket from his pocket. This ticket also indicated it was paid for in cash. Agent Perry then asked Henderson for identification. She informed him she had left her driver's license on the train and volunteered to show it to him. Henderson re-boarded the train, with Agent Perry following, to retrieve it.

Henderson obtained her driver's license from her backpack. Agent Perry

then asked Henderson if he could search her bag, to which she agreed.[5] He also inquired about her travel plans. Henderson informed Agent Perry she and Anthony had traveled to California to visit Anthony's parents. Agent Perry then asked Henderson if Anthony had any luggage. Henderson lied, telling Agent Perry that Anthony had no luggage and was wearing clothes under his clothes.[6] Agent Perry left the train and returned to speak with Anthony. He asked Anthony if he had any relatives in California; Anthony informed him he had an uncle. Agent Perry then requested and received permission to pat down Anthony's person, uncovering nothing. Thereafter, Agent Perry left and Henderson rejoined Anthony. According to Henderson, Anthony told her that if anyone inquired about his suitcase to deny knowing who it belonged to. Suspecting that the suitcase may contain marijuana, Henderson replied, "All right." (*Id.* at 90.)

Meanwhile, Agent Perry had re-boarded the train. There, he discovered a black suitcase in the area where Anthony and Henderson were seated. Attempting

---

[5] Henderson testified that after Agent Perry checked her bag, she gave him permission to search her person. Agent Perry testified he did not recall searching Henderson's person and his report did not indicate he did so. Anthony alleges Agent Perry's version of the events is the correct one, otherwise Agent Perry would have discovered the $2,284 later seized from Anthony's person upon his arrest. This theory supports Anthony's contention that Henderson had given him this money because she did not want to be caught with it.

[6] Henderson stated she lied to Agent Perry because she "was scared after he told me who he was, after he showed me his badge and explained to me who he was." (R. Vol. V at 88-89.)

to discover its ownership, Agent Perry asked several passengers if the suitcase belonged to them or if they knew who it belonged to. Those efforts being unsuccessful, he questioned Anthony and Henderson about the suitcase. Both denied any interest in the suitcase or its contents. Determining that the suitcase was abandoned, Agent Perry carried it to an empty train car, where he opened it. Inside the bag was 993.3 grams of cocaine, which had been wrapped inside several bags. The bag also contained several male clothing items including a black size XL T-shirt with an imprint stating "Omerta, No suckers allowed, Last of a dying breed" (*id.* at 230), an eyeglass case, and a pair of dirty, old gray size 10 New Balance tennis shoes. On that day, Anthony was wearing a white XXXL T-shirt containing the imprint "No suckers allowed, Omerta made, men only" and a pair of new gray size 10 New Balance tennis shoes. (*Id.* at 231.) Anthony and Henderson were arrested.

After their arrests, Anthony and Henderson were searched. Agents seized $2,284 wrapped in rubberbands in an envelope from one of Anthony's pockets. They also found a pair of glasses on Anthony's person. Henderson had no money but a rubberband was discovered on her person.

The next day, Henderson and Anthony were transported to court for their initial appearances. According to Henderson, during their transport, Anthony told her she would "only get two years or three years or so" because she had no prior

record. (*Id.* at 93.) Henderson understood this to mean that Anthony wanted her to take responsibility for the cocaine. She informed him she would not take responsibility for the drugs.

Subsequently, after Henderson had been released pretrial, Anthony called her twice from prison. During these conversations, Anthony asked her how she was doing, whether she had talked to her attorney and what her attorney was telling her. He also told her they needed to stay in contact and that he was going to write her a letter. Soon thereafter, Henderson received a letter from the Sandoval County Detention Center in Albuquerque, New Mexico, where Anthony was detained pending trial. The return address stated it was from Ricardo Anthony. The letter started: "What[']s up Harry!"[7] (Addendum to Appellant's Opening Br. at 22.) The letter began in the first person but switched to the third person, discussing someone called "son." (*Id.* at 22-23.) Henderson testified Anthony and his brother called each other son. In relevant part, the letter stated:

> You know that son has all his faith in you, that you'll do what[']s expected of you, and you should know what that is!! This is where you show that you are for him 100% and he looks forward to that from you. . . . Son said that you can beat this case like Rocky; all you have to do is stand strong in his corner. It's you and son against the Agency. . . .

_____

[7] Henderson testified "Harry" probably referred to her because her last name is Henderson, she is "real hairy" and Anthony referred to her as "Harry and the Hendersons," a television program. (R. Vol. V at 170.)

(*Id.*)  Henderson interpreted the letter as another request from Anthony to take responsibility for the cocaine.

## II.  Procedural Background

On August 1, 2003, Henderson and Anthony were indicted for conspiracy to possess with intent to distribute 500 grams and more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846 (Count 1) and possession with intent to distribute 500 grams and more of cocaine in violation of 21 U.S.C. § 841(a)(1),(b)(1)(B) and 18 U.S.C. § 2 (Count 2).  On October 21, 2003, Henderson pled guilty to Count 1.  Anthony proceeded to trial in November 2003.

At trial, Henderson testified against Anthony, alleging the black suitcase and cocaine belonged to him.[8]  During her direct examination, the prosecutor asked Henderson about the letter she received from Anthony.  When asked what made her think the letter was from Anthony, she responded:

> Because the front says, or the front of the letter, the postmark, says it's from Albuquerque, New Mexico, *and from the detention center.* Then it starts off saying that he's okay and he's doing good, and he could be doing better.  So it sounds like it starts off from him.

(R. Vol. V at 97 (emphasis added).)  Immediately after this response, the prosecutor requested a bench conference.  During the bench conference, defense

---

[8] In her plea agreement, Henderson agreed to provide truthful testimony at Anthony's trial.  Although she denied knowing about the cocaine in the suitcase, she testified she pled guilty because she was responsible for knowing that an illegal substance of some kind (she thought it was marijuana) might have been in the suitcase.

counsel objected to Henderson's reference to the detention center, arguing it violated the government's agreement not to solicit such information.[9] The prosecutor admitted she had only advised Henderson not to mention Anthony's criminal history and marijuana use. Anthony's attorney then moved for a mistrial, claiming the reference to the detention center was prejudicial because it informed the jury that Anthony is in custody. Although the court disagreed, it offered to give a limiting instruction. Defense counsel rejected such an instruction, stating he did not believe it would be helpful. After a short recess, the court formally denied Anthony's motion for a mistrial but again offered to give a limiting instruction, which Anthony's attorney again declined.

Although Anthony did not testify, his trial strategy was to implicate Henderson as the one who set him up as her "fall guy" (R. Vol. VI at 361), emphasizing the incredible nature of her version of the events, her lies to Agent Perry, her daily marijuana habit, and the benefits of her plea agreement.[10] He

---

[9] Prior to trial, the government filed a motion in limine for a preliminary ruling regarding the admissibility of the letter. The district court held a hearing and ruled in favor of the letter's admissibility. During the hearing, the government agreed to redact any reference to the detention center on the letter and its envelope.

[10] Henderson was facing a mandatory minimum sentence of five years. Pursuant to her plea agreement, in exchange for her guilty plea and cooperation, the government agreed Henderson was entitled to a three-level downward adjustment for acceptance of responsibility (USSG §3E1.1) and a four-level downward adjustment for her minimal role in the offense (USSG §3B1.2). It also agreed Henderson may be eligible for safety-valve relief under USSG §5C1.2 and 18 U.S.C. § 3553(f), entitling her to a sentence below the statutory minimum. Anthony emphasized these benefits to the jury, implying Henderson

contended it was Henderson who was responsible for the trip to California, pointing out she was the one who secured the airline tickets, registered at the hotel, carried the black suitcase several times at the train station and reached into it several times while on the train. He also suggested to the jury that Henderson had given Anthony the money found on his person so she would not be caught with it[11] and that she had written the letter she claimed Anthony had sent her.

The jury found Anthony guilty of both counts in the indictment.[12] He was sentenced to ninety-seven months imprisonment.[13]

### III. Discussion

Anthony contends the district court abused its discretion in denying his

---

had a substantial interest in cooperating with the government by testifying against him.

[11] Anthony pointed out that Agent Perry did not discover the money when he patted him down and that a rubberband was seized from Henderson's person upon her arrest.

[12] At trial, Agent Perry testified that the train Anthony and Henderson were traveling on originated in California, a drug source state, and is referred to as the "drug train." (R. Vol. V at 282.) He also testified concerning the differences in security between a train station and an airport, stating the latter has higher security requirements, including secondary screenings of luggage and people, whereas bags are not searched at a train station. By offering this testimony, the government sought to imply to the jury that Anthony chose the three day train trip back to Washington, D.C., over a five hour plane ride, because he did not want the cocaine discovered in his bag.

[13] Based on an offense level of 26 and a criminal history category III, the sentencing guideline range was seventy-eight to ninety-seven months imprisonment. The district court concluded a sentence at the top of the guideline range was appropriate based on Anthony having requested Henderson to take responsibility for the cocaine.

motion for a mistrial based on Henderson's reference to his pretrial detention. He claims her testimony concerning his detention, coupled with her testimony that he had asked her to take responsibility for the cocaine because she did not have a criminal record, essentially informed the jury he had a criminal record. Therefore, he asserts her testimony impressed upon the jury that Anthony was untrustworthy and dangerous, while Henderson was so reliable she was released pretrial. He maintains this was extremely prejudicial because in order for the jury to convict him, it had to determine whether to believe Henderson's testimony that Anthony manipulated her or Anthony's defense that Henderson duped him.

Anthony further asserts that the prosecutor's role in soliciting the improper testimony weighs in favor of a mistrial. He claims the prosecutor should have realized her open-ended question to Henderson would have elicited the response it did because Henderson had testified at the pretrial motion in limine hearing that one reason she knew the letter came from Anthony was due to the detention center's return address and stamp on the envelope. Anthony also argues the prosecutor knew such information was prejudicial because she had agreed at the hearing to redact from the letter and its envelope any references to the detention center.

Lastly, because of the less than overwhelming evidence against him, Anthony maintains it cannot be said with reasonable certainty that Henderson's

reference to his pretrial detention had only a "very slight effect" on the jury's verdict. (Appellant's Opening Br. at 26 (quoting *United States v. Sands*, 899 F.2d 912, 916 (10th Cir. 1990).) He claims the government relied heavily upon Henderson's testimony, and therefore her credibility, to obtain his conviction. He claims her credibility was seriously called into question by the improbable lengths she went to in her testimony to distance herself from the cocaine, her lies to Agent Perry, her daily marijuana use and the benefits she received from her plea agreement if she testified against him. In contrast, he claims uncontested evidence supported his defense, including (1) documentary evidence (i.e. the Western Union receipt and the hotel registration) demonstrating Henderson was responsible for the trip to California, (2) Henderson's admission that she made a number of phone calls at the hotel (which Anthony contends could have been made to arrange for the cocaine transfer), (3) Henderson's testimony that she carried and had ready access to the black suitcase, and (4) the fact a rubberband was found on Henderson's person which suggests Henderson gave Anthony the $2,284 in order to frame him.

In response, the government argues Henderson's testimony concerning Anthony's pretrial detention is not grounds for a mistrial. It states her testimony indicates only that Anthony was in a detention center when he wrote the letter (logically as a result of his arrest in the case), not that he had a criminal record,

was dangerous or guilty of any crime. Therefore, the government maintains the district court appropriately characterized her testimony as evidence of pretrial confinement and properly denied his mistrial motion based on *United States v. Wright*, 564 F.2d 785, 789 (8th Cir. 1977) (holding"the district court properly declined to grant a mistrial on the ground that there 'was a possibility' that one or more of the jurors may have seen the defendants handcuffed in the custody of the marshal[]"). Additionally, the government claims that in light of all of the evidence presented at trial against Anthony, Henderson's testimony concerning his pretrial detention had a very slight, if any, impact on the jury's verdict.

"A trial court may appropriately grant a mistrial only when a defendant's right to a fair and impartial trial has been impaired; a decision we review for an abuse of discretion."[14]  *United States v. Caballero*, 277 F.3d 1235, 1242 (10th Cir. 2002). "Whether a motion for mistrial should be granted is within the discretion of the trial judge because he is in the best position to evaluate the effect of the offending evidence on the jury." *United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir. 1980). Motions for a mistrial require us to examine the prejudicial

---

[14] The government argues Anthony never objected to Henderson's testimony concerning Anthony asking her to take responsibility for the cocaine because she did not have a criminal record. Therefore, it claims our review is for plain error. However, Anthony is not challenging this testimony; rather, he refers to this testimony in an attempt to demonstrate the prejudicial effect her reference to his pretrial detention had on the jury. Therefore, our review is for an abuse of discretion.

impact of an error when viewed in the context of the entire case. *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004).

Although Anthony has not styled his claim as one of prosecutorial misconduct, in cases such as this, "where the prosecutor asked a question her witness answered in a potentially improper way, a similar analysis is appropriate." *Id.* The prosecutorial misconduct analysis requires us to determine (1) whether the prosecutor acted in bad faith, for instance, whether the prosecutor solicited the improper remark and whether the prosecutor's line of questioning was reasonable, (2) whether the district court limited the effect of the improper statement through its jury instructions, and (3) whether the improper remark was inconsequential in light of the other evidence demonstrating the defendant's guilt. *Id.* at 1283 & n. 3.

Here, the prosecutor solicited Henderson's remark and knew, based on Henderson's testimony at the motion in limine hearing, that her question would probably solicit the response she received. The prosecutor also apparently recognized the prejudicial nature of the comment, having agreed at the hearing to redact any reference to the detention center on the letter and its envelope. However, the prejudicial effect of Henderson's testimony could have been substantially reduced with a limiting instruction, which the court offered to give but defense counsel declined. Although "we do not wish to prevent a defendant's [] counsel

-15-

from making a tactical decision that such an instruction would do more damage than good," cautionary instructions are generally preferred. *Sands*, 899 F.2d at 915 (quotations omitted). In cases such as this one, where the improper testimony is passing in nature, the usual basis for declining a limiting instruction is to prevent calling undue attention to the improper testimony. This is not Anthony's argument nor does he contend this was his strategy in declining a limiting instruction. Rather, Anthony argues a cautionary instruction would not have been helpful because the improper testimony made such a strong impression on the jury that it would have been unable to disregard it. This argument is unpersuasive. The court could have instructed the jury that Anthony was detained in the Sandoval County Detention Center pending trial and that his pretrial detention was not to be considered for purposes of determining his guilt or innocence. While we continue to respect a defense counsel's strategic decision not to seek a limiting instruction where such instruction would do "more damage than good," we continue to endorse such instructions, especially where, as here, a limiting instruction would have significantly reduced the possibility of prejudice resulting from the improper testimony.

More importantly, however, the district court properly denied Anthony's mistrial motion because the improper testimony was inconsequential on the jury's verdict in light of the other evidence of his guilt. Although Anthony attempts to

characterize this case as a "he says/she says" case and that either Henderson or Anthony was responsible for the cocaine, the jury could have easily determined based on the evidence that *both* were responsible. Even ignoring the reference to Anthony's pretrial detention and Henderson's testimony that she did not have a prior record (thus implying that Anthony did have a prior record and therefore his pretrial detention was based on his dangerousness), the evidence of Anthony's guilt was overwhelming. Agent Perry testified Anthony denied any association with the black suitcase yet clothing matching what Anthony was wearing was found in the suitcase. The suitcase was found on the train near where Anthony and Henderson were sitting. Additionally, Henderson was unemployed at the time of the trip. Therefore, although Henderson may have wired the money for the airline tickets and registered for the hotel room, it was logical for the jury to believe that Anthony, who was employed, paid for the trip to California and was a willing participant. Moreover, a large sum of money was found on Anthony's person when he was arrested.[15]

## IV.  Conclusion

Based on the above, the district court did not abuse its discretion in denying

---

[15] Anthony relies on *Sands* but that case is clearly distinguishable. Here, unlike in *Sands*, the evidence of Anthony's guilt was overwhelming. *See Sands*, 899 F.2d at 915-16 (overruling the district court's denial of a mistrial, emphasizing the evidence that the defendant killed with premeditation and malice aforethought was not overwhelming).

Anthony's motion for a mistrial.  The district court's judgment is **AFFIRMED**.


                              **Entered by the Court:**

                              **Terrence L. O'Brien**
                              United States Circuit Judge