FILED
United States Court of Appeals
Tenth Circuit

January 2, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

JOHN WAYNE HARGROVE,

      Defendant - Appellant.

No. 17-2102

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 2:16-CR-02705-RB-2)**

---

Ryan A. Ray, Norman Wohlgemuth Chandler Jeter Barnett & Ray, Tulsa, Oklahoma, for Defendant-Appellant.

Dustin C. Segovia, Assistant United States Attorney (John D. Tierney, Acting United States Attorney, with him on brief), Office of the United States Attorney for the District of New Mexico, Las Cruces, New Mexico, for Plaintiff-Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

United States Border Patrol agents found Defendant-Appellant John Wayne Hargrove, his girlfriend Janelle Richter, and Edgar Silvas-Hinojos in the desert near the border between Arizona and New Mexico. They were all in Mr. Hargrove's truck, along with nearly 300 pounds of marijuana and two firearms. Mr. Hargrove was subsequently charged with two offenses: (1) conspiracy to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 846; and (2) possession with the intent to distribute 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, and aiding and abetting said possession, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2. After a two-day jury trial, Mr. Hargrove was found guilty and sentenced to sixty months' imprisonment.

Mr. Hargrove now raises two challenges on appeal. First, with regard to his trial, Mr. Hargrove asserts that the district court erred in failing to grant him a mistrial after the prosecutor elicited testimony that the district court had previously barred. Second, Mr. Hargrove contends that the district court erred in failing to grant him safety-valve relief under § 5C1.2 of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). Because we hold that the district court did not err with respect to either ruling, we **affirm**.

# I

## A

One night in February 2016, a Border Patrol agent detected seven backpackers in the desert near Rodeo, New Mexico.[1]  This rural area is known for narcotics trafficking.  After that agent observed the backpackers, he alerted other Border Patrol agents, who moved in to apprehend the backpackers.  The agents observed the seven backpackers enter an area containing ranching equipment.  Six of the seven backpackers then left this area without their backpacks.  The agents detained these six backpackers.  The backpackers were dressed in camouflage clothing and wearing carpeted booties on their feet, which are typically worn to mask footprints.  They admitted they had entered the country illegally.

The dispatched agents then began looking for the missing (i.e., seventh) backpacker and the discharged backpacks.  The agents discovered a truck that appeared to be occupied by two individuals who were "trying to conceal themselves or pretend[ing] to be sleeping in the truck, kind of slouching low in their chairs."  R., Vol. III, at 46 (Trial Tr., dated Oct. 17–18, 2016).  As they approached, the agents could detect the smell of marijuana emanating from the truck.  An agent tapped on the truck's window and asked the occupant on the

---

[1]      In the narcotics-trafficking context, a "backpacker" is a person who smuggles marijuana across the United States-Mexico border.  *See* R., Vol. III, at 36–37 (Trial Tr., dated Oct. 17–18, 2016).

driver's side—a woman, later identified as Ms. Richter—to roll down the window. After she did so, Ms. Richter got out of the vehicle. Likewise, an agent also asked the occupant of the front passenger's side of the vehicle—a man, later identified as Mr. Hargrove—to get out of the truck. Mr. Hargrove complied. There was also a third person in the truck, in the back seat on the passenger's side, who the agents had not originally seen. This man, later identified as Mr. Silvas-Hinojos, also exited the truck. The agents believed that Mr. Silvas-Hinojos was the seventh backpacker.

After the three occupants exited the truck, an agent noticed a bundle of marijuana lying in the center of the truck's back seat. Agents also found and seized more bundles of marijuana in the bed of the truck; these bundles were partially covered by a tarp. The government later learned (through the cooperation of Mr. Silvas-Hinojos) that Mr. Hargrove had received the bundles of marijuana from the backpackers and strapped them down in the bed of his truck. In total, the agents seized approximately 297 pounds of marijuana from the truck.

When Mr. Hargrove exited the truck, an agent patted him down and found two knives on his person. After another agent noticed a rifle in the truck's back seat, Mr. Hargrove told the agents that he had "two weapons inside the vehicle," including the rifle. *Id.* at 263. The second firearm, a pistol, was found on the truck's dashboard inside a bag bearing an Oakland Raiders emblem. At the time of these events, Ms. Richter was wearing a jacket with an Oakland Raiders

4

emblem that matched the one on the bag containing the pistol. Mr. Hargrove, Ms. Richter, and all of the backpackers were arrested.

After his arrest, Mr. Hargrove again "admitted the loaded rifle and pistol found in his truck belonged to him." *Id.*, Vol. II, ¶ 8, at 5 (Presentence Investigation Report ("PSR"), dated Jan. 26, 2017). The agents asked Mr. Hargrove about the bundles of marijuana they had found in his truck, and he told the agents that he believed the bundles were alfalfa, not marijuana, and that he was simply in the area to go fishing.

**B**

Mr. Hargrove was charged with two counts: (1) conspiracy to distribute more than 100 kilograms of marijuana in violation of 21 U.S.C. § 846; and (2) possession with the intent to distribute 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, and aiding and abetting said possession, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and 18 U.S.C. § 2. Ms. Richter and two of the backpackers were charged with similar crimes, but these three pleaded guilty pursuant to plea agreements. Mr. Hargrove proceeded to trial.

**1**

Prior to trial, Mr. Hargrove filed a motion in limine requesting that the district court exclude all evidence regarding firearms or knives, including "all purported testimony [that] one of the firearms [was] stolen." Suppl. R. at 12–14

(Mr. Hargrove's Mot. in Lim., dated Oct. 10, 2016). This motion contended that "the possession of the firearms was simply part of his property" and that Mr. "Hargrove made no attempt to hide or distance himself from the firearms," and it argued, among other things, that admitting evidence that one of the firearms was stolen would be unduly prejudicial. *Id.* at 13–14.

The district court resolved this motion in a written order. It reasoned that "[t]he presence of loaded firearms that Defendant admitted belong to him, and their location in the cab of the truck[,] is probative of Defendant's knowledge and of his agreement to participate in a drug trafficking scheme." *Id*. at 18 (Mem. Op. and Order, dated Oct. 14, 2016). The court further ruled that the probative value of this evidence was not substantially outweighed by potential prejudice; thus, the evidence was admissible. But the court adopted a contrary stance regarding the stolen nature of one of the firearms, concluding that "the fact that one of the firearms was stolen is not particularly probative of any fact at issue." *Id.* Consequently, the court found this evidence to be inadmissible, as the risk of prejudice substantially outweighed any conceivable relevance. Thus, the court granted the motion in part, excluding any testimony concerning the stolen nature of one of the firearms but allowing testimony about the presence of loaded firearms in the truck.

At trial, Mr. Hargrove's strategy was to raise doubt regarding whether he knew of the drug-trafficking activity and knowingly agreed to participate in it.

Specifically, during opening statements, Mr. Hargrove's counsel told the jury that Ms. Richter "arranged this marijuana deal," R., Vol. III, at 202, that she had asked to borrow Mr. Hargrove's vehicle, *id.*, that she told Mr. Hargrove that they were going to "camp out" at a fishing hole and "hang out for a few days," *id.* at 202–03, and that Mr. Hargrove—without any knowledge of the planned drug-trafficking activity—agreed to do that, *id.* at 203.

However, in eliciting testimony concerning the presence of loaded firearms in order to undermine this defense, as authorized by the district court, the prosecution strayed into forbidden territory. In response to the prosecutor's questions, a Border Patrol agent testified that one of the firearms had been stolen:

> Q. Agent [], is this -- are these the two individuals that you arrested that night?
> A. Yes sir.
> Q. And you notice [Ms. Richter] has also an Oakland Raiders decal on her jacket?
> A. Yes, yes, sir.
> Q. Is that basically what the bag was like also with where the gun was?
> A. Yeah, it was a black bag with an Oakland Raiders emblem on it.
> Q. And the defendant, though, was the one that told you where the gun was?
> A. Yes, sir.
> Q. Did you ever ascertain ownership of that gun?
> A. No, sir.
>    . . . .
> Q. Did you eventually ascertain ownership of the gun?
> A. I ran records checks on both weapons and the truck, yes, sir.
> Q. And to whom did it come back to?
> A. The truck came back to the defendant. The rifle came

7

back as a clear weapon and *the pistol came back as stolen*. *Id.* at 264–65 (emphasis added).

Mr. Hargrove's counsel objected and immediately moved for a mistrial, arguing that the testimony about the stolen gun could not be "cure[d] with an instruction." *Id.* at 265. The district court held a hearing on the issue outside of the jury's presence. The court first asked the agent if he had been instructed not to testify about the stolen nature of the gun. The agent answered that he had been informed to disregard the fact that the gun was stolen, but "misunderstood the question" and stated that he did not "know how to answer [the question] without . . . not telling the truth." *Id.* at 268. The prosecutor admitted "it's my fault," conceding that he did not "frame the question correctly." *Id.* Accordingly, the court concluded that the error lay with the prosecutor and that the agent was not to blame for the utterance. The court subsequently took the motion for a mistrial under advisement. *See id.* at 269 ("[T]his is how I'm going to play it: I am going to take under advisement the motion to mistrial. I'm going to instruct the jury when they get back that they are to completely disregard the answer. And then I'm going to see how the testimony proceeds and -- well, we'll see where it goes.").

The court called the jury back into the courtroom and gave the following instruction:

Ladies and gentlemen, in the preliminary instruction this

8

morning, I told you that if, at some point in the trial, I told you to disregard something that you heard, then you couldn't consider that matter in your deliberations later in the trial. Well, that's happened. So right before you left for your break, there was a statement made by the agent that one of the firearms may have been stolen. The stolen nature of those firearms is not at issue in this case. That is not something that you need to consider. In fact, I'm going to ask you and expect you to disregard *anything regarding that firearm or its ownership*. That's not something you need to concern yourself with in this trial.

And as we talked this morning, what's before you are the two charges, conspiracy and possession with intent on the marijuana. There isn't any charge related to firearms, their ownership, and it would be inappropriate for you to consider those facts in addressing the facts that are actually in front of you and the elements of the charges that are actually in front of you. *So please disregard any thought or connection relating to the ownership of that firearm*.

*Id.* at 284–85 (emphases added). Following that instruction, the trial resumed and the prosecutor quickly finished his cross-examination of the agent.

Moreover, the prosecutor took remedial measures during the remainder of the trial: specifically, the prosecutor (1) withdrew an exhibit displaying all weapons retrieved from the truck, *see id.* at 25 ("[T]he government would not oppose removing [Government's Exhibit Number 15, i.e., a photo of the guns and knives] if it will help alleviate some of the damage that was done. So since the jury hasn't seen it, the government, without objection from defense, will withdraw that exhibit."); (2) did not seek testimony from its expert witness regarding the use of firearms in the narcotics trade, even though it had filed a notice with the court regarding expert testimony in this area; and (3) did not

9

discuss either of the guns during its closing argument.

After the close of all of the evidence but prior to closing arguments, the district court denied the motion for mistrial, concluding that the prosecutor's violation of the court's ruling was not "intentional" but rather "was a mistake . . . caused by an inartfully asked question." *Id.* at 138. The court further concluded that, in light of all of the evidence, the improper testimony was not "consequential." *Id.* The defense renewed its objection after the court's ruling but seemed to agree that the prosecutor had not acted in bad faith in eliciting the testimony. *Id.* at 139 ("Obviously, I don't think the issue of whether it was in bad faith or not is really at issue here. What's at issue is the prejudice of the exact nature of the testimony that was specifically excluded that came in. And it is of such nature that the only fair remedy to this proceeding would be to declare a mistrial.").

Then, after the closing arguments, the court again instructed the jury:

> During the trial, I didn't let you hear answers to some of the questions that the lawyers asked and sometimes I ordered you to disregard things you saw or heard or I struck things from the record. You must completely ignore all of those things. Don't even think about them. Don't speculate about what a witness might have said. These things are not evidence and you're bound by your oath not to let them influence your decision in any way.

*Id.* at 144. After approximately one hour of deliberation, the jury found Mr. Hargrove guilty on both counts.

**2**

Following Mr. Hargrove's conviction, the U.S. Probation Office prepared a PSR noting that the mandatory-minimum sentence was sixty months' imprisonment and computing an advisory Guidelines sentencing range of sixty to sixty-three months' imprisonment. *Id.*, Vol. II, at 1–15 (PSR, dated Jan. 26, 2017).[2]

In his Sentencing Memorandum and Objections to the PSR, Mr. Hargrove argued that he qualified for the safety valve under U.S.S.G. § 5C1.2 and, therefore, his sentence should have been calculated without regard to the otherwise-applicable mandatory minimum.[3] *See id.*, Vol. I, at 40–42

---

[2] The Probation Office used the 2016 edition of the Guidelines in calculating Mr. Hargrove's sentence. Neither party questions this choice on appeal; therefore, we also rely on the 2016 edition, to the extent that it is relevant to the resolution of the issues on appeal.

[3] The Guidelines safety-valve provision (i.e., § 5C1.2) traces back to a statutory safety-valve provision that Congress had enacted, 18 U.S.C. § 3553(f); this provision permits a district court to disregard the otherwise applicable statutory mandatory minimum and to sentence a defendant in accordance with the advisory Guidelines and the sentencing factors of 18 U.S.C. § 3553(a). *See, e.g.*, *United States v. Smart*, 518 F.3d 800, 803 (10th Cir. 2008) ("Section 3553(a) mandates consideration of its enumerated factors . . . ."); *United States v. Altamirano-Quintero*, 511 F.3d 1087, 1091 (10th Cir. 2007) (noting that the statutory safety-valve provision "permits the district court to disregard a statutory mandatory minimum sentence and instead impose a sentence within the advisory sentencing guidelines range"); *United States v. Acosta-Olivas*, 71 F.3d 375, 379 (10th Cir. 1995) ("In sum, § 3553(f), as repeated in guideline [U.S.S.G.] § 5C1.2, was clearly intended to permit courts to sentence relatively less culpable offenders to sentences below an otherwise applicable mandatory statutory minimum sentence."). In U.S.S.G. § 5C1.2, not only has the Sentencing Commission "set[] forth the relevant provisions" of § 3553(f), but it also "has promulgated application notes to provide guidance in the application of the

(continued...)

(Sentencing Mem. & Objs. to PSR, dated Apr. 24, 2017). In particular, Mr. Hargrove disputed whether he had "possess[ed] a firearm or other dangerous weapon . . . in connection with the offense." U.S.S.G. § 5C1.2(a)(2). Mr. Hargrove asserted that there was no evidence that the firearms' presence "had anything to do with the marijuana transaction"; consequently, Mr. Hargrove reasoned that he was eligible for safety-valve relief under § 5C1.2. R., Vol. I, at 41. After making other arguments for the application of reductions and a variance, Mr. Hargrove requested a sentence of eighteen months' imprisonment.

During the first of two sentencing hearings, Mr. Hargrove's counsel argued that the transaction resulting in his arrest was not a "typical drug situation" that was "real dangerous" because money was not exchanged between the backpackers and the individual picking up the drugs. *Id.*, Vol. III, at 7 (Sentencing Hr'g Tr., dated May 4, 2017). He thus reasoned that Mr. Hargrove would not have needed to bring a firearm for protection. The district court rejected this argument, noting

---

[3](...continued)
statute." U.S.S.G. § 5C1.2, cmt. background. Mr. Hargrove's safety-valve argument before the district court was consistently framed in terms of the Guidelines provision, § 5C1.2. Though his opening brief is sprinkled with several citations to the statutory safety-valve provision, § 3553(f), Mr. Hargrove also primarily invokes the rubric of § 5C1.2 in stating his appellate challenge. Aplt.'s Opening Br. at 1 (stating the issue for review as whether "Mr. Hargrove possess[ed] a firearm in connection with the offenses of which he was convicted, such that he was ineligible for the safety valve under [U.S.S.G.] § 5C1.2?"). Given that the Guidelines safety-valve provision restates verbatim the relevant text of the statutory safety-valve provision, Mr. Hargrove's litigation decision on this point is of no moment in our analysis.

12

that "[i]f I'm going to my first big drug deal in Rodeo -- in a farm outside Rodeo, New Mexico, in the dark of the night with a bunch of guys, backpackers, coming over the hill, I might think I needed to be protected." *Id.* at 8. Mr. Hargrove's counsel also argued that the weapons were unrelated to the offense, as many individuals in remote areas carry weapons because of "snakes," "varmints," and "things of that nature." *Id.* at 9. The court, however, expressed skepticism, questioning "[h]ow many of those [weapons used as protection against animals] [we]re stolen," like one of Mr. Hargrove's guns. *Id.* Because of the potential for a "big swing" based on the application *vel non* of the safety valve, the court recessed for further research on how to treat the firearms. *Id.* at 16.

In a written order, the district court denied Mr. Hargrove safety-valve relief. Specifically, the district court stated: "The only question at issue is whether [Mr. Hargrove] possessed the firearms 'in connection with the offense.'" *Id.*, Vol. I, at 23 (Mem. Op. and Order, dated May 25, 2017) (quoting 18 U.S.C. § 3553(f)). The district court recited the relevant facts: Mr. Hargrove and both guns were found in the cab of the truck, and most of the marijuana was found close by in the truck's bed; both guns were loaded; and Mr. Hargrove evinced knowledge of the location of the guns by voluntarily telling the agents about them. The district court concluded that "[b]oth [the] proximity and the potential [of the weapons] to facilitate the offense" established that the weapons were possessed "in connection with the offense." *Id.* at 23–24. The court further

13

reasoned that "[e]ven if the firearms did not directly facilitate the drug transaction, they certainly had the potential to do so." *Id.* at 24. The court concluded: "Under these circumstances, Defendant has not met his burden by a preponderance of the evidence to demonstrate eligibility for the safety valve. Thus, Defendant is subject to the statutory mandatory minimum sentence of 60 months." *Id.*

The court then held a second sentencing hearing. During his allocution, Mr. Hargrove stated: "I had my guns with me 'cause I was going to work and I might come across a rattlesnake." *Id.*, Vol. III, at 324 (Sentencing Hr'g Tr., dated June 7, 2017). He further stated that at the time of his arrest he "was four and a half feet away from [his] weapon." *Id.* at 327. The district court subsequently sentenced Mr. Hargrove to sixty months' imprisonment, the applicable mandatory-minimum sentence. Mr. Hargrove now appeals.

## II

We are presented with two issues in this appeal: (1) whether the district court erred in failing to grant Mr. Hargrove's motion for a mistrial after the Border Patrol agent testified about the stolen nature of Mr. Hargrove's pistol, and (2) whether the district court erred in failing to grant Mr. Hargrove safety-valve relief under U.S.S.G. § 5C1.2. Because we conclude that the district court did not err with respect to either issue, we affirm the court's judgment as to Mr. Hargrove's conviction and sentence.

14

**A**

We first address Mr. Hargrove's assertion that the district court erred by denying his motion for a mistrial after the Border Patrol agent testified that the pistol in Mr. Hargrove's car was stolen, in direct contravention of the district court's ruling in limine. As discussed below, we conclude that Mr. Hargrove's arguments in support of this assertion are unavailing.

"We review a district court's refusal to grant a mistrial for abuse of discretion. The district court has discretion to grant a mistrial only when a defendant's right to a fair and impartial trial has been impaired." *United States v. Meridyth*, 364 F.3d 1181, 1183 (10th Cir. 2004) (citation omitted). "This calculus calls for 'an examination of the prejudicial impact of an error . . . viewed in the context of an entire case.'" *United States v. Wells*, 739 F.3d 511, 532 (10th Cir. 2014) (quoting *Meridyth*, 364 F.3d at 1183). "While there are 'cases where the prejudicial effect cannot be erased because the evidence is of such a nature that it necessarily interferes with the jury's impartial consideration of other evidence,' '[t]he general rule is that the effect of improper evidence may be remedied by admonishing the jury to disregard and by withdrawing the evidence.'" *Id.* at 533 (alteration in original) (quoting *United States v. Laymon*, 621 F.2d 1051, 1053 (10th Cir. 1980)).

"Under the abuse of discretion standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the

lower court has made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *United States v. Chanthadara*, 230 F.3d 1237, 1248 (10th Cir. 2000) (quoting *United States v. Thompson*, 908 F.2d 648, 650 (10th Cir. 1990)).  Or, put another way, "[w]e will not disturb a district court's decision to deny a motion for a mistrial unless the decision 'was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment.'"  *United States v. Templeman*, 481 F.3d 1263, 1265 (10th Cir. 2007) (quoting *United States v. Stiger*, 413 F.3d 1185, 1194 (10th Cir. 2005), *abrogated in part on other grounds by Alleyne v. United States*, 570 U.S. 99, 108 (2013)).

In determining whether a mistrial is necessary "where the prosecutor asked a question her witness answered in a potentially improper way," the nonexhaustive set of factors that we consider "include": (1) whether the prosecutor acted in bad faith, (2) whether the district court limited the effect of the improper statement through its instructions to the jury, and (3) whether the improper remark was inconsequential in light of the other evidence of the defendant's guilt.  *Meridyth*, 364 F.3d at 1183.  Here, all three factors weigh in favor of affirming the district court's decision.

**1**

The parties first dispute whether the prosecutor acted in bad faith in eliciting the Border Patrol agent's improper testimony about the stolen gun.  The

16

district court found no bad faith by the prosecutor, specifically ruling that the prosecutor did not act in an "intentional" manner in eliciting the improper testimony but, rather, made "a mistake," and that the testimony was "caused by an inartfully asked question." R., Vol. III, at 138. We conclude that the district court's assessment was firmly grounded in the record evidence and legally sound.

We primarily rest our conclusion on two variables that our caselaw has deemed to be significant in the bad-faith inquiry.[4] First, we have inquired whether "the prosecutor . . . intentionally elicit[ed] the statement in question." *Meridyth*, 364 F.3d at 1184; *see United States v. Kamahele*, 748 F.3d 984, 1017 (10th Cir. 2014) (discerning no bad faith in part because "[t]he mistake appear[ed] to be innocent"). And, second, we have noted whether the prosecutor acknowledged the improper character of the testimony and took steps to mitigate its prejudicial effects. *See Wells*, 739 F.3d at 533 (affirming denial of a motion

---

[4] During oral argument on the motion for mistrial before the district court, Mr. Hargrove's trial counsel seemed to concede that the prosecutor did not act in bad faith. *See* R., Vol. III, at 139 ("Obviously, I don't think the issue of whether it was in bad faith or not is really at issue here. What's at issue is the prejudice of the exact nature of the testimony that was specifically excluded that came in."). The government acknowledges this apparent concession here but does not argue that it is dispositive. *See* Aplee.'s Resp. Br. at 24 ("Contrary to Hargrove's assertion of bad faith on appeal, as Hargrove's trial counsel acknowledged and as the district court found, the government did not act in bad faith in asking the questions that it did."). In light of the government's approach, we are content to accord the apparent concession of Mr. Hargrove's counsel on the bad-faith issue little weight in our analysis, though it is not irrelevant. It is simply noteworthy in passing that Mr. Hargrove's trial counsel, who saw the prosecutor's questioning of the agent in real time—just as the trial judge did—did not at that time view the prosecution's conduct as evidencing bad faith.

17

for mistrial in part because the "prosecutor attempted to change the subject immediately after" the inappropriate testimony); *cf. Meridyth*, 364 F.3d at 1184 (noting that the prosecutor's failure to fully acknowledge the improper nature of the testimony "somewhat belied" her "ostensibly innocent explanation" for eliciting the testimony).

Turning to the first variable, though it is undisputed that the prosecutor's questions elicited the improper, stolen-gun testimony, the district court did not clearly err in finding that the prosecutor did so inadvertently (i.e., by mistake), not with bad intent. *See Meridyth*, 364 F.3d at 1184. The Border Patrol agent stated that the prosecutor told him not to testify about the stolen nature of the gun. *See* R., Vol. III, at 268. The fact that the prosecutor specifically instructed the agent *not* to testify about the stolen nature of the gun significantly undermines any notion that the prosecutor's intent was to put the improper testimony before the jury. *See Kamahele*, 748 F.3d at 1017 (concluding that the prosecutor's "mistake appear[ed] to be innocent [because] the prosecutor informed the district court that she had previously instructed the witness not to discuss" the improper testimony).

In response, Mr. Hargrove points to the fact—ostensibly suggestive of ill intent—that the prosecutor repeatedly inquired about the ownership of the gun before the agent uttered the improper testimony. But, at least under the circumstances here, this tells us virtually nothing about whether the prosecutor

18

acted with bad intent or was simply careless and persistently so.

And, in this factual setting, we view the second variable—the prosecutor's conduct in acknowledging the improper character of the testimony and taking steps to mitigate its prejudicial effects—as strongly indicating that the prosecutor did not act in bad faith. First, in the immediate aftermath of the improper testimony, the prosecutor admitted that his questioning was unclear and that he was at fault for causing the testimony to be uttered. *See* R., Vol. III, at 268 ("I think it's my fault because I didn't ask [the pertinent questions] clear[ly] enough. But I didn't intend to violate the order. I just didn't -- I didn't frame the question correctly."). This immediate acceptance of responsibility—while certainly not dispositive—provides some support for the conclusion that "the prosecutor did not intentionally elicit the statement in question." *Meridyth*, 364 F.3d at 1184. Indeed, the prosecutor's conduct here contrasts markedly with the prosecutor's conduct in *Meridyth*. There, instead of immediately accepting responsibility for adducing the improper testimony, the prosecutor spent much of her "response to the motion for a mistrial" trying to convince the court that there actually was an evidentiary basis for the introduction of the testimony; the prosecutor could reasonably be understood from this line of argument as saying that, *even if she did intend to* adduce the testimony, her conduct would not have been improper. *Id.* We concluded in *Meridyth* that the prosecutor's approach "somewhat belied" her "ostensibly innocent explanation," which was based on the view that she did *not*

19

actually intend to adduce the testimony. *Id.* In short, the prosecutor's immediate acceptance of responsibility here is significantly probative of the prosecutor's lack of bad faith.

We view in a similar light the prosecutor's efforts to mitigate the prejudicial effects of the improper testimony throughout the remainder of the trial. Once he resumed the examination of the agent (i.e., following the improper utterance), the prosecutor immediately veered his questioning away from the stolen gun and began inquiring about other issues; he thereafter quickly ended his examination of the agent:

> Q. Agent [], did you find any binoculars in the vehicle?
> A. There was a set of night-vision goggles inside the vehicle.
> Q. Where in the vehicle were they?
> A. I don't recall. I did not locate them, myself.
> [Prosecutor]: I'll pass the witness, Your Honor.

R., Vol. III, at 285. Such a dramatic shift supports the district court's finding that the prosecutor did not intend to put the improper testimony before the jury in the first place. *See Wells*, 739 F.3d at 533. Furthermore, moving past the immediate aftermath of the improper testimony, the prosecution went to great lengths to limit any damage caused by the testimony by taking the following steps: (1) withdrawing an exhibit that displayed all of the weapons retrieved from the truck; (2) forgoing testimony from its expert witness regarding the use of firearms by drug traffickers to safeguard their narcotics loads, even though it had given notice of expert testimony to this effect; and (3) avoiding any discussion of the guns

20

during its closing argument. In sum, the prosecutor's actions—both immediately after eliciting the improper testimony and throughout the remainder of the trial—clearly evince a strong intent to mitigate any prejudicial effects of the improper testimony, rather than an intent to highlight or cement such effects. Such remedial efforts strongly suggest that the prosecution did not intend to elicit the improper testimony to begin with.

To be sure, we noted in *Meridyth* that one of the "helpful" inquiries "subsumed within the 'bad faith' factor" is whether the prosecutor's "line of questioning was reasonable." 364 F.3d at 1183 n.3. Mr. Hargrove underscores this point, arguing that "there was no reason for this [i.e., the prosecutor's] line of questioning" and that "the line of questioning was wholly unreasonable." Aplt.'s Opening Br. at 27–28. In response, the government contends that the prosecutor's questioning was designed (albeit inartfully) to establish that Mr. Hargrove had claimed ownership of the firearms, in order (1) to show that he was aware of the drug transaction that was going on, and (2) to avoid the jury drawing an incorrect inference from the testimony that immediately preceded the ownership line of questioning—that is, testimony about Ms. Richter wearing an Oakland Raiders jacket with an emblem that matched the one on the Oakland Raiders bag containing the pistol. More specifically, the government contends that the prosecutor apparently reasoned that "the jury could have inferred [wrongly from the fact that the bag displayed the same Oakland Raiders emblem as Ms. Richter's

21

jacket] that it was Richter's bag and Richter's firearm, even though Hargrove was aware of the location of the firearm." Aplee.'s Resp. Br. at 20. Accordingly, the government argues that the testimony was relevant to undermine Mr. Hargrove's defense theory that Ms. Richter planned the entire event and that he agreed to go along on the trip with lawful purposes in mind, without knowledge of the drug-trafficking activity.

On this specific point, however, we are not persuaded by the government's argument. Recall that, among other things, the prosecutor asked the agent with respect to the pistol: "Did you ever ascertain ownership of that gun?" and "[T]o whom did it come back to?" R., Vol. III, at 264–65. Under these circumstances, we are hard-pressed to discern the relevancy of any testimony regarding the legal ownership of the pistol. Indeed, if the prosecutor just wanted to establish for the jury that it was Mr. Hargrove—not Ms. Richter—who possessed the pistol and brought it to the drug transaction (with the attendant inference that Mr. Hargrove knew drug-trafficking activity was going on and needed the firearm to protect it), the prosecutor could have simply asked the agent if he knew whether anyone laid claim to the pistol during the arrests and investigation of the crime. And the agent almost certainly would have responded that Mr. Hargrove did so.

Based on the foregoing, we therefore do not find the government's argument regarding the reasonableness of its line of questioning persuasive. However, the prosecution can act unreasonably without acting in bad faith. Given

22

the totality of the circumstances here, we reject Mr. Hargrove's suggestion that this one factor "weighs heavily in favor of a finding that the Government acted in bad faith." Aplt.'s Opening Br. at 28. As noted, the district court's finding that the prosecutor elicited the improper testimony through inadvertence—rather than intentionally—is firmly supported by the record, and the prosecutor's conduct in promptly acknowledging the improper character of the testimony and taking steps to mitigate its prejudicial effects strongly supports the conclusion that the prosecutor did not act at the outset in bad faith in eliciting the improper testimony. In light of these circumstances, we feel confident in rejecting any suggestion that the prosecutor's questioning amounted to "a gratuitous attempt to improperly influence the jury" through placing improper testimony before it about the stolen nature of the pistol. *Meridyth*, 364 F.3d at 1184. More generally, considering all of the circumstances, we conclude that the prosecutor did not act in bad faith, and that this criterion weighs heavily in the government's favor.

**2**

We next consider whether the district court's instructions following the testimony about the stolen gun "limited the effect of the improper statement . . . to the jury." *Meridyth*, 364 F.3d at 1183. We conclude that this factor also weighs heavily in the government's favor.

We presume that jurors "follow their instructions." *Id.* at 1184; *United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008) ("We presume that jurors

23

will follow clear instructions to disregard evidence . . . ." (quoting *United States v. Caballero*, 277 F.3d 1235, 1243 (10th Cir. 2002))). However, this presumption may be overcome: "[W]here the character of the testimony is such that it will create so strong an impression on the minds of the jurors that they will be unable to disregard it in their consideration of the case, although admonished to do so, a mistrial should be ordered." *Maestas v. United States*, 341 F.2d 493, 496 (10th Cir. 1965); *see also Lamy*, 521 F.3d at 1266 (noting that the presumption applies "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant" (quoting *Caballero*, 277 F.3d at 1243)).

Mr. Hargrove contends that the agent's improper testimony made the "sort of strong impression" described in *Maestas*, Aplt.'s Opening Br. at 31, but his assertions on this issue are entirely conclusory. He vaguely references his opening brief's "discussion of the third factor" (i.e., of whether the agent's testimony was inconsequential), *id.*, without ever mentioning what components of this discussion are relevant under *Maestas*. Indeed, he never again mentions *Maestas*, nor does he discuss its facts or analyze what "character of . . . testimony" is necessary to give rise to the kind of "strong impression" that a jury might be unable to disregard. *Maestas*, 341 F.2d at 496. Therefore, we view Mr. Hargrove's contention as waived. *See, e.g.*, *United States v. Pursley*, 577 F.3d 1204, 1231 n.17 (10th Cir. 2009) (noting that a "skeletal reference does not

24

present a cognizable issue for appellate review"); *accord United States v. Gordon*, 710 F.3d 1124, 1144 n.22 (10th Cir. 2013). And we properly turn our attention to assessing the import of the district court's instructions, which we presume the jury followed.

As noted above, the district court gave two limiting instructions, one directly in the wake of the improper testimony and one after the close of evidence. In brief, in its instructions, the court told the jury both (1) to disregard the specific testimony about the stolen nature of the pistol, and (2) to completely ignore any and all inferences regarding the pistol—with the clear aim of giving the agent's testimony no influence in the jury's decision-making. In other words, the court effectively instructed the jurors to act as if they had never heard the stolen-gun testimony and to avoid thinking about that testimony.

Despite the seeming clarity of those instructions, Mr. Hargrove asserts that the district court's approach was inadequate because the court did not "specifically and expressly indicate[]" that the jury should *not* reach the "potential conclusion" that "by virtue of possessing a *stolen* gun, Mr. Hargrove's character was that of a criminal and he had a propensity to commit criminal acts." Aplt.'s Opening Br. at 29. He further contends that the court should have "also *specifically* instruct[ed] the jury to refrain from considering the evidence as proof of [his] criminal propensity." Aplt.'s Reply Br. at 8. In support of his position, Mr. Hargrove cites to both *Meridyth* and *United States v. Hardwell*, 80 F.3d 1471

25

(10th Cir.), *modified in part on reh'g*, 88 F.3d 897 (10th Cir. 1996). However, neither of those cases supports his position.

More specifically, Mr. Hargrove argues that the district court's instructions in this case were "confusing and not particular enough" when compared to the district court's instructions in *Meridyth* because they did not specify which inference the jury could *not* make—*viz.*, it could not infer from the stolen nature of the gun that Mr. Hargrove had a propensity towards crime. Aplt.'s Opening Br. at 29. In *Meridyth*, the panel observed that, after testimony was elicited from which the jury could have inferred that the defendant threatened a witness, the district court "took great pains to instruct the jury not to infer" that such a threat had taken place and that the effect of such instructions "in th[at] case" was to "preclude the improper inference" of the threat.[5] *Meridyth*, 364 F.3d at 1184.

---

[5]        To provide helpful context, we reproduce below the salient aspects of the district court's instructions quoted in *Meridyth*:

> After an exhaustive discussion with counsel and my own examination of this witness out of your hearing, I have determined a couple of things.

> First, it appears that the United States Attorney asked the question regarding why this witness moved to, in part, explain why the United States Government, through the United States Attorney's Office, has provided $1000 in assistance for this individual to move. You will recall that the witness said he moved because of threats made against him.

> In part, an inference that you could draw from that statement was that the threats were made by [a co-defendant] and Mr. Meridyth.

(continued...)

26

Juxtaposed with the *Meridyth* court's specific instructions, Mr. Hargrove

maintains, the district court's instructions here were inadequate. We disagree.

The district court's instructions here actually had a broader prophylactic

scope than the ones in *Meridyth*; they necessarily reached not only the specific

inference relating to the stolen-gun that concerned Mr. Hargrove—i.e., the

inference that he possessed a criminal propensity—but *each and every* other

inference relating to the testimony about the gun. Recall that the court explicitly

and unequivocally instructed the jury to "to disregard *anything* regarding that

firearm or its ownership." R., Vol. III, at 284 (emphasis added). Anything means

anything. More specifically, anything would include any criminal-propensity

inferences stemming from the stolen nature of the gun. Moreover, the court did

not take any chances that the jury might not comprehend its all-encompassing

instructions that the jury should put out of mind any inferences related to the

[5](...continued)

> I am telling you now that that would be an improper inference,
> based on all of the information I now know. You will recall that
> this witness was working on at least 40 cases with the drug task
> force. That gives this witness ample opportunity to make a lot of
> enemies.

> While I have no reason to doubt that—the likelihood that what
> motivated him to move were threats, it can't be said, based on
> any credible evidence now known to the Court that those threats
> can be connected to these defendants. And you may not infer that
> they do, based on the evidence we now have.

364 F.3d at 1182–83 (quoting the record).

27

stolen firearm—*including* possible inferences regarding Mr. Hargrove's criminal propensities. The court expressly and specifically emphasized that the jury was not to consider "a statement made by the agent that one of the firearms may have been stolen." *Id.* Thus, based on the court's instructions, we presume the jury understood that it was obliged not to consider *any* inferences based on the testimony about the stolen firearm; this would necessarily *include* an inference that Mr. Hargrove possessed a criminal propensity because the pistol was stolen.[6]

Mr. Hargrove's only retort to this seems to be that the instructions were "confusing" because they "appear[ed] to only indicate that the testimony . . . could not be used to find Mr. Hargrove guilty of the charged offenses." Aplt.'s Opening Br. at 29. Mr. Hargrove is correct that the court's instructions

---

[6] Our decision in *Wells*, moreover, underscores the adequacy of the court's instructions. There, the subject of the defendant's motion for mistrial was a witness's improper testimony that prior to trial the defendant had been offered "a plea offer" (which he presumably rejected). 739 F.3d at 532. In upholding the district court's denial of the motion, we observed that the court's "curative instruction . . . was 'clear and concise and pertained to testimonial evidence from a single witness that was amenable to easy segregation in the minds of the jury.'" *Id.* at 533 (quoting *Caballero*, 277 F.3d at 1243). Yet, that instruction simply stated: "Ladies and gentlemen, disregard that last answer. I'll strike it from the record. We're getting into an area that's not proper for jury consideration." *Id.* at 532. Recognizing (as we do) that the adequacy of instructions must be understood in light of all of the circumstances of a particular case, it nevertheless would strain credulity to believe that, after endorsing this brief curative instruction in *Wells*, this court should conclude here that the district court's broadly protective instructions—that obliged the jury to completely disregard the stolen-gun testimony and any inferences related to it—were not sufficiently clear or otherwise adequate to cure any prejudice. Notably, Mr. Hargrove's reply brief does not respond to the government's similar argument based on *Wells*.

specifically cautioned the jury that the stolen-gun testimony was not relevant to its consideration of the charged crimes:

> [W]hat's before you are the two charges, conspiracy and possession with intent on the marijuana. There isn't any charge related to firearms, their ownership, and it would be inappropriate for you to consider those facts in addressing the facts that are actually in front of you and the elements of the charges that are actually in front of you.

R., Vol. III, at 284. But in virtually the same breath the court spoke more broadly, saying "please disregard *any* thought or connection relating to the ownership of that firearm." *Id.* at 284–85 (emphasis added). And this advisement must be read in the context of court's earlier instructions to the jury, which made plain that it must "disregard *anything* regarding that firearm or its ownership." *Id.* at 284 (emphasis added). Thus, the district court's instructions here actually cast a wider protective net than the ones that we approved of in *Meridyth*. Captured within this net was precisely the concern that Mr. Hargrove points to here—*viz.*, the concern that the jury might infer that he had criminal propensities from the stolen nature of the firearm. Taking all of these instructions into account, we are hard-pressed to understand how a reasonable jury could have not understood that, not only could it not consider the stolen-gun testimony in finding him guilty of the charged offenses, but it also could not use this testimony for *any* purpose.[7] In sum, Mr. Hargrove's arguments based on the trial court's

---

[7] In any event, we question what material prejudice Mr. Hargrove

(continued...)

instructions in *Meridyth* are unavailing.

Lastly, Mr. Hargrove's reliance on our decision in *Hardwell* is another wrong note in Mr. Hargrove's tune of criminal-propensity error, which we may address in short order. Specifically, Mr. Hargrove turns to *Hardwell* to support his contention that the district court erred by not sua sponte specifically instructing the jury to disregard any inference arising from the stolen-gun testimony that Mr. Hargrove had a propensity to commit crimes. In this regard, quoting from *Hardwell*, 80 F.3d at 1491, Mr. Hargrove notes that we have "previously held that a district court committed error by failing to advise the jury . . . in a limiting instruction" that prior uncharged misconduct cannot be used as proof of criminal propensity. *See* Aplt.'s Opening Br. at 30 (quoting *Hardwell*'s observation that "the court's instructions did not expressly advise the jury that it could not consider prior misconduct as proof of criminal disposition or propensity, which is what Rule 404(b) is intended to prevent").

However, *Hardwell* is inapposite: it expressly relates to a district court's

---

[7](...continued)
could claim even if the jury did feel free to infer from the stolen gun-testimony that he had criminal propensities, so long as it also felt obliged to honor the court's instructions *not* to use this inference in determining whether he was guilty of the charged offenses. Put another way, even if the court's instructions gave the jury the leeway (which they did not) to infer from the stolen-gun testimony that Mr. Hargrove had tendencies to be a scofflaw, it is hard to see how Mr. Hargrove could have been materially prejudiced by such an inference, if the jury stayed true to the court's instructions and did not use this inference in determining his guilt of the charged offenses.

failure to employ appropriate limiting instructions in admitting prior wrongful-acts evidence under Federal Rule of Evidence 404(b), and on appeal "[a]ll four defendants contend[ed] the trial court abused its discretion by admitting evidence of prior bad acts" under that rule. 80 F.3d at 1488. The evidence before the jury was admissible for some purposes, but not others. *Id.* at 1491 ("[A]lthough it could consider the evidence of Dennis' and Marcel's prior misconduct as proof of the money laundering charge and 1992 cocaine sale charges, it could not consider that evidence as proof of the conspiracy, except to the extent that it proved intent."). Here, on the other hand, the district court did not admit the disputed testimony for any purpose; it expressly excluded it. Therefore, there was no need for the court to even consider providing a more specific limiting instruction regarding the testimony, as in *Hardwell*. Under the district court's instructions, the jury could not consider the stolen-gun testimony for any purpose—full stop. *Hardwell* is thus inapposite.

Accordingly, because the district court's instructions unequivocally admonished the jury that it could not consider the testimony or *any* inferences stemming from it, and because it is permissible to presume here that the jurors followed the court's instructions, *see Lamy*, 521 F.3d at 1266, this factor weighs heavily in the government's favor.

**3**

Finally, we consider whether the improper remark was inconsequential in

31

light of the other evidence of the defendant's guilt. *See Meridyth*, 364 F.3d at 1183. This factor strongly undermines Mr. Hargrove's position and, combined with the two other factors discussed above, firmly closes the door on his mistrial challenge.

The crux of Mr. Hargrove's argument is that the improper stolen-gun testimony "completely reframed the way the jury viewed [him]," Aplt.'s Opening Br. at 33, because "the jury would [have] likely view[ed] him as a 'bad' man, the kind of man that would [have been] involved in a scheme to possess and distribute marijuana – without regard to the actual evidence presented," *id.* at 32–33. However, the weight of the "actual evidence" against Mr. Hargrove—which undermined his defense theory that he had no knowledge of the drug-trafficking activity afoot—would have rendered any prejudice from the stolen-gun testimony inconsequential.

Although the trial presented considerable evidence that pointed towards Mr. Hargrove's guilt, we need not detail it all here. That is because, even standing alone, two lines of unchallenged evidence clearly incriminated Mr. Hargrove in the charged drug trafficking, and a reasonable jury could have concluded that this evidence convincingly belied Mr. Hargrove's defense theory predicated on his unawareness of that activity. More specifically, without more, these two lines of evidence established that "nothing about [the Border Patrol agent's improper] comment changed the basic nature of [Mr. Hargrove's] trial." *United States v.*

32

*Kravchuk*, 335 F.3d 1147, 1155 (10th Cir. 2003).[8]

First, and perhaps most damning, is the testimony from one of the backpackers, Mr. Silvas-Hinojos. During trial, Mr. Silvas-Hinojos testified that Mr. Hargrove himself met the backpackers when they arrived and personally took marijuana that Mr. Silvas-Hinojos was carrying; that Mr. Hargrove arranged the bundles of marijuana on the bed of the truck and covered the bundles with a tarp; and that Mr. Hargrove put one bundle of marijuana in the backseat of the truck because the stack of bundles in the truck bed was "too high." R., Vol. III, at 310–13. Significantly, Mr. Silvas-Hinojos's testimony on these matters was left entirely without specific challenges during the course of the trial. As such, that undisputed testimony unequivocally indicated that Mr. Hargrove knew of and actively participated in the drug exchange, undercutting his defense theory and

---

[8] In assessing the weight of the government's evidence and the related effect of the agent's improper stolen-gun testimony, we do not factor into the calculus the dubious testimony of Mr. Hargrove's co-defendant, Ms. Richter. The government asserts that Ms. Richter's testimony undermines Mr. Hargrove's defense theory because she testified that Mr. Hargrove was the one who arranged the marijuana deal. To be sure, Ms. Richter, during her direct examination, did finger Mr. Hargrove as the brains behind the operation. However, we question the reliability of this ostensibly incriminating testimony because Ms. Richter admitted that she had taken full responsibility for all of the events that occurred and wholly exculpated Mr. Hargrove in her plea agreement. *See* R., Vol. III, at 97 (testifying that she (i.e., Ms. Richter) had previously stated that she, and not Mr. Hargrove, had planned the drug transaction and that she planned it because she was in need of money). Given that the two lines of unchallenged evidence discussed above unequivocally pointed the jury to Mr. Hargrove's guilt—rendering the effect of the agent's improper stolen-gun testimony inconsequential—we need not rely on Ms. Richter's dubious testimony to support our analysis here.

pointing directly toward a guilty verdict. Notably, Mr. Hargrove likewise fails to address the significance of this testimony on appeal.

Second, the government presented testimony from numerous agents throughout trial that Mr. Hargrove's defense that he thought the marijuana (all 297 pounds of it) was alfalfa was incredible because alfalfa and marijuana smell nothing alike and are packaged in entirely distinct ways. *See, e.g.*, *id.* at 47 ("Q. Did you notice anything when [Ms. Richter] rolled down the window? A. I could immediately smell the smell of marijuana. Q. Have you spent any time around alfalfa, [agent]? A. A little bit. My aunt had a cattle farm down in Mexico, growing up. I've been around it. And also, through the work here, I've seen it. Q. Does it smell anything like marijuana? A. No, it does not."); *see also id.* at 65–66 (testifying that alfalfa is not packaged the same way as marijuana: "[Alfalfa is] actually not packaged. It's kind of bounded [sic] together by wire. As far as I know, they try to keep all the moisture out of it because if it gets wet or whatever . . . it spoils, so . . . they try to keep it open-air"); *id.* at 66–67 ("Q. And in your 12 years as a law enforcement officer, have you encountered a lot of marijuana? A. Yes, sir. Q. Do you know what marijuana smells like? A. I do. Q. In your experience, does alfalfa smell like marijuana? A. Not at all"); *id.* at 238 (after testifying that the marijuana was packaged in bundles, an agent further testifying: "Q. Have you seen alfalfa before? A. Yes, sir, I have. Q. In your experience, how is alfalfa packaged? A. Usually, three strand wires, maybe four

34

strands, sometimes twine"). The ample testimony on this front would have made patent to the jury that Mr. Hargrove's defense was based on a far-fetched assertion that he mistakenly believed that the marijuana was alfalfa. Again, Mr. Hargrove does not raise any specific challenge to this testimony on appeal.

Thus, we believe that these two lines of evidence, taken by themselves, strongly and convincingly directed the jury to a guilty verdict. Therefore, we are quite confident that any "improper effect [the Border Patrol agent's] intimations may have had on the jury . . . pales in comparison to the total weight of the government's evidence." *Lamy*, 521 F.3d at 1266. Accordingly, we conclude that this factor too weighs in favor of affirming the district court's denial of Mr. Hargrove's motion for mistrial.

* * *

In light of the above analysis, and given that all three factors of the *Meridyth* test weigh in favor of the government, we conclude that the district court did not abuse its discretion in denying Mr. Hargrove's motion for a mistrial.

**B**

We now turn to Mr. Hargrove's second challenge: he contends that the district court erred when it did not grant him a U.S.S.G. § 5C1.2 safety-valve adjustment during sentencing. More specifically, Mr. Hargrove argues that the district court "erred by considering only Mr. Hargrove's possession of the firearms and their and his proximity to the marijuana, without taking into account

35

Mr. Hargrove's own conduct." Aplt.'s Opening Br. at 7. We disagree and affirm the district court's safety-valve ruling. In the following discussion, we recount (1) the district court's ruling, (2) our standard of review, (3) the legal framework governing our analysis, and (4) how that framework applies in this case.

**1**

Generally, the district court evaluated whether Mr. Hargrove possessed the firearms "in connection with the offense," U.S.S.G. § 5C1.2(a)(2), by looking to their "proximity and potential to facilitate the offense." R., Vol. I, at 24 (quoting *United States v. Andrade-Vargas*, 459 F. App'x 762, 767 (10th Cir. 2012) (unpublished)). Applying that rubric, the district court concluded that Mr. Hargrove was not eligible for the safety-valve reduction because (1) the firearms were located "in the cab of the pickup truck with Defendant and the marijuana," and thus were in close proximity to the drug trafficking, and (2) the firearms "had the potential" to facilitate the drug trafficking, even if the firearms did not do so directly. *Id.*

More specifically, the district court highlighted several facts in support of its decision, including: that Mr. Hargrove, the drugs, and both guns were all in the cab of the pickup truck—with the pistol on the dashboard and the rifle behind the front seat; that both guns were loaded; and that Mr. Hargrove evinced knowledge of the location of the guns, since he voluntarily told the agents about them. The court expressly took note of Mr. Hargrove's exculpatory statements "that he had

36

no knowledge of the marijuana, he was in the area to fish, and he thought the bundles of marijuana were alfalfa," but effectively declined to credit those statements, finding instead that "[t]he presence of firearms was not coincidental or entirely unrelated to the drug transaction." *Id.* at 22, 24; *see also id.*, Vol. III, at 8 (regarding the presence of the guns, the district court stated: "If I'm going to my first big drug deal in Rodeo -- in a farm outside Rodeo, New Mexico, in the dark of the night with a bunch of guys, backpackers, coming over the hill, I might think I needed to be protected"). In sum, the district court determined that Mr. Hargrove "ha[d] not met his burden by a preponderance of the evidence to demonstrate eligibility for the safety valve" and thus he was "subject to the statutory mandatory minimum sentence of 60 months." *Id.*, Vol. I, at 24.

**2**

We review the district court's denial of U.S.S.G. § 5C1.2 safety-valve relief for clear error, "giving due deference to the district court's application of the Sentencing Guidelines to the facts." *United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1184 (10th Cir. 2004). "Clear error exists if a factual finding 'is wholly without factual support in the record, or after reviewing the evidence, we are definitively and firmly convinced that a mistake has been made.'" *United States v. Hooks*, 551 F.3d 1205, 1217 (10th Cir. 2009) (quoting *United States v. Ivory*, 532 F.3d 1095, 1103 (10th Cir. 2008)). And this deferential standard of review "applies equally regardless of whether the district court's factual findings

37

are based on credibility determinations or on documentary evidence." *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009); *accord United States v. Little*, 60 F.3d 708, 713 (10th Cir. 1995); *see also United States v. Galvon-Manzo*, 642 F.3d 1260, 1270–71 (10th Cir. 2011) (observing, in analyzing defendant's challenge to safety-valve determination, that although district court's evaluation of attorney reports did not evaluate the defendant's credibility "in the typical sense, the court was considering the truthfulness and 'credibility' of all the information he provided in various ways to the government and to the court," and declining to disturb the district court's "obvious[]" determination that defendant was not trustworthy).

**3**

**a**

Congress has enacted mandatory-minimum sentencing provisions for many different crimes, including the drug-trafficking offenses at issue here. *See, e.g.*, 21 U.S.C. §§ 841(a)(1), (b)(1)(B). However, Congress has "refine[d]" the operation of those mandatory-minimum provisions for "the least culpable participants" in federal drug-trafficking offenses by creating an exception to mandatory-minimum sentences, known as the safety valve, which applies when defendants meet certain criteria. H.R. REP. NO. 103-460, at 3 (1994), 1994 WL 107571; *see* 18 U.S.C. § 3553(f); *see also United States v. Pena-Sarabia*, 297 F.3d 983, 988 (10th Cir. 2002) ("The basic purpose of the safety valve was 'to

38

permit courts to sentence less culpable defendants to sentences under the guidelines, instead of imposing mandatory minimum sentences.'" (quoting *Acosta-Olivas*, 71 F.3d at 378)); *accord United States v. Brooks*, 722 F.3d 1105, 1108 (8th Cir. 2013) ("In the safety valve statute and parallel advisory guidelines provision, 'Congress provided relief for less culpable drug offenders from its harsh mandatory minimum sentences.'" (quoting *United States v. Tournier*, 171 F.3d 645, 646 (8th Cir. 1999))).

At Congress's direction, the Sentencing Commission has inserted the safety valve provision into the Guidelines. *See* U.S.S.G. § 5C1.2, cmt. background. Section 5C1.2(a) provides relief under the safety valve if the defendant can meet the following criteria:

> (1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines before application of subsection (b) of §4A1.3 (Departures Based on Inadequacy of Criminal History Category);
>
> (2) the defendant did not use violence or credible threats of violence or *possess a firearm or other dangerous weapon* (or induce another participant to do so) *in connection with the offense*;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848; and
>
> (5) not later than the time of the sentencing hearing, the

defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

§ 5C1.2(a)(1)–(5) (emphases added).[9]  The defendant bears the burden of satisfying all five criteria by a preponderance of the evidence.  *United States v. Verners*, 103 F.3d 108, 110 (10th Cir. 1996).  If the defendant satisfies all five criteria, the sentencing "court shall impose a sentence without regard to a statutory minimum."  *Zavalza-Rodriguez*, 379 F.3d at 1185.

**b**

Here, only the second criterion—whether Mr. Hargrove "possess[ed] a firearm . . . in connection with the offense"—is at issue because the government has conceded that Mr. Hargrove otherwise qualifies for the safety valve.  We note three principles informing what it means to possess a firearm "in connection with the offense," before summarizing one case particularly important to our analysis.

**i**

First, we have held that a firearm is possessed "in connection with the offense" if the firearm facilitates or, as relevant here, has the "potential to facilitate" the offense.  *United States v. Hallum*, 103 F.3d 87, 89 (10th Cir. 1996),

---

[9]  These five criteria replicate the relevant statute's requirements.  *See* 18 U.S.C. § 3553(f)(1)–(5).

*overruled on other grounds by Pena-Sarabia*, 297 F.3d at 989 & n.2 (overruling

by an en banc footnote). *Hallum*'s "facilitate or potential to facilitate" concept

arose out of statutory and Guidelines provisions that are analogous to the firearms

component of the safety-valve provision. For example, we interpreted similar

language in the Guidelines enhancement for defendants who possess a firearm "in

connection with another felony offense" as applying when "the weapon facilitates

or has the potential to facilitate . . . the offense." *United States v. Walters*, 269

F.3d 1207, 1219 (10th Cir. 2001) (quoting *United States v. Gomez-Arrellano*, 5

F.3d 464, 466–67 (10th Cir. 1993)).[10]

In doing so, we relied on the Supreme Court's interpretation of whether a

firearm was used "in relation to" an offense in *Smith v. United States*, 508 U.S.

223, 238 (1993), *partially abrogated on other grounds by Bailey v. United States*,

516 U.S. 137 (1995). *See Gomez-Arrellano*, 5 F.3d at 466–67. In *Smith*, the

Supreme Court had interpreted the "in relation to" language as requiring that "the

gun at least must 'facilitat[e], or ha[ve] the potential of facilitating,' the drug

---

[10] *Walters* and *Gomez-Arrellano* both addressed previous iterations of U.S.S.G. § 2K2.1(b)(5). *See* U.S.S.G. § 2K2.1(b)(5) (1992) ("If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense, increase by 4 levels. If the resulting offense level is less than level 18, increase to level 18."); U.S.S.G. § 2K2.1(b)(5) (1998) (same); *see also Walters*, 269 F.3d at 1218; *Gomez-Arrellano*, 5 F.3d at 466. The Guidelines applicable at the time of the offense contained similar language. U.S.S.G. § 2K2.1(b)(6)(B) (2016).

41

trafficking offense." 508 U.S. at 238 (quoting *United States v. Stewart*, 779 F.2d 538, 539 (9th Cir. 1985) (Kennedy, J.), *overruled in part on other grounds, as recognized in Muscarello v. United States*, 524 U.S. 125, 137 (1998)).[11] Thus, in light of the foregoing, we should consider Mr. Hargrove's possession of the firearms to have been "in connection with the offense" only if the firearms facilitated or had the potential to facilitate the offense.

Second, we have focused on "the defendant's own conduct" in evaluating his eligibility for safety-valve relief. *Zavalza-Rodriguez*, 379 F.3d at 1186. Thus, for example, we have ruled that proof of "a joint criminal actor's reasonably foreseeable possession of a firearm" is *not* "sufficient to foreclose" a defendant from receiving safety-valve relief. *Pena-Sarabia*, 297 F.3d at 988–89 & n.2 (overruling *Hallum* "to the extent it is inconsistent with th[is] rule" of law). This focus on a defendant's own conduct is fully in accord with the Sentencing Commission's commentary, which ordinarily controls our interpretation of the advisory Guidelines. *See United States v. Gieswein*, 887 F.3d 1054, 1058 (10th

---

[11] Though the *Hallum* panel did not expressly mention the historical origins of the "potential to facilitate" linguistic formulation, other panels of this court, albeit in unpublished decisions, have recognized its historical roots. *See United States v. Archuleta*, 257 F. App'x 116, 123 (10th Cir. 2007) (unpublished) (connecting *Hallum*'s "potential to facilitate" language with *Walters*, 18 U.S.C. § 924(c)(1), and U.S.S.G. § 2K2.1(b)(5)); *see also United States v. Castaneda Ascencio*, 260 F. App'x 69, 71–72 (10th Cir. 2008) (unpublished) (quoting and affirming the district court's statement that *Gomez-Arrellano*'s "analysis is applicable to the application of Sentencing Guideline Section 5C1.2," before relying on *Hallum*'s "potential to facilitate" language).

42

Cir.) (noting that the Guidelines "commentary from the Sentencing Commission is 'authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline'" (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993))), *cert. denied*, 139 S. Ct. 279 (2018); *accord United States v. Lucero*, 747 F.3d 1242, 1247 (10th Cir. 2014). As relevant here, the Commission expressly "limit[ed] the accountability of the defendant to *his own conduct* and conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." U.S.S.G. § 5C1.2 cmt. n.4 (emphasis added).

Third and relatedly, *Zavalza-Rodriguez* emphasized that "possession in § 5C1.2(a)(2) is an *active possession* whereby there is a close connection linking the individual defendant, the weapon and the offense." 379 F.3d at 1187 (emphasis added).

### ii

*Zavalza-Rodriguez* offers helpful instruction regarding the contours of the "own conduct" and "active possession" principles described *supra*. Therefore, we turn to look at *Zavalza-Rodriguez* in more depth.

*Zavalza-Rodriguez* discussed these two principles in explaining why the firearms provision of the safety valve is materially distinct from a related firearms enhancement in § 2D1.1(b)(1). That Guideline provides for an offense-level enhancement for certain convicted drug traffickers "[i]f a dangerous weapon

43

(including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). In *Zavalza-Rodriguez*, police officers found the defendant in a home that contained narcotics, material used to package narcotics, five firearms, and a large amount of cash. 379 F.3d at 1184. The officers found one of the firearms, a loaded semiautomatic pistol, in the room where the defendant was staying. *Id.* The home was owned by a third party who also was involved in selling narcotics, and the defendant claimed that he had only spent one night in the home. *Id.*

In his plea agreement, the defendant had stipulated to a sentencing enhancement pursuant to § 2D1.1(b)(1), which applies when "a dangerous weapon (including a firearm) was possessed," based on the presence of the pistol; however, the defendant separately argued that he was eligible for the safety valve because the gun was not possessed "in connection with" the offense within the meaning of § 5C1.2. *Id.* In particular, while the defendant acknowledged that he had constructively possessed the gun through his knowledge of the gun's presence in the bedroom where he stayed, he denied ever actually possessing or even touching the gun. *Id.* at 1184–85. The district court accepted this argument, and held the defendant was eligible for the safety valve, because there was a lack of evidence connecting the defendant to the gun. *Id.* at 1184.

We affirmed. To start, we "explain[ed] that while a § 2D1.1(b)(1) sentence enhancement applies to a defendant for a co-conspirator's possessing a weapon, a defendant is *not* precluded from receiving a safety valve reduction [in the context

44

of such a conspiracy] based on the defendant's individual conduct," if that conduct does not run afoul of the firearms component of the safety-valve provision. *Id.* at 1186 (emphasis added); *see also id.* (noting that, "[a]lthough conspiracy was not charged in the information, [the defendant's] situation is closely analogous to the facts of these cases"). This is because in evaluating the safety-valve provision, unlike § 2D1.1(b)(1), we focus on the defendant's "own conduct" and "recognize a distinction between constructive and actual possession." *Id.* Thus, while a co-conspirator's possession of a firearm might satisfy § 2D1.1(b)(1), the Guidelines commentary to the safety-valve provision limits a defendant's accountability to his "own conduct." U.S.S.G. § 5C1.2 cmt. n.4.

As for "active possession" of a firearm—which, as noted, entails a "close connection linking the individual defendant, the weapon and the offense"—we reasoned that this requirement prevents mere constructive possession (without more) from satisfying the safety-valve provision, though it might satisfy § 2D1.1(b)(1). *Zavalza-Rodriguez*, 379 F.3d at 1186–87.[12] However, we specifically distinguished situations involving mere constructive possession, as in *Zavalza-Rodriguez*, from those where a defendant acknowledged actual

---

[12] *See also United States v. Gutierrez-Casillas*, 140 F. App'x 26, 28 (10th Cir. 2005) (unpublished) ("We concluded [in *Zavalza-Rodriguez*] that § 2D1.1(b)(1) merely requires 'constructive possession,' based on proximity of the gun, whereas § 5C1.2 requires 'actual possession,' which is characterized by a closer degree of connection." (quoting *Zavalza-Rodriguez*, 379 F.3d at 1186–88)).

45

possession of a firearm.  *Id.* at 1186 n.2.  Taking note of our prior precedent, especially *Hallum*, we acknowledged that, when a defendant "did not argue that the gun was not actually his nor that it was merely constructively possessed," "a gun's proximity and potential to be used in connection with the offense" may well be sufficient to bar safety-valve relief.  *Id.* (citing *Hallum*, 103 F.3d at 89).[13]

---

[13] We made this acknowledgment in the course of harmonizing the principles announced in *Zavalza-Rodriguez* with our prior precedent, most notably in *Hallum*, where we held that "a firearm's proximity and potential to facilitate the offense is enough to prevent application of [U.S.S.G.] § 5C1.2(2)," 103 F.3d at 89.  *See Zavalza-Rodriguez*, 379 F.3d at 1186 n.2.  Because "[i]n cases of conflicting circuit precedent our court 'follow[s] earlier, settled precedent over a subsequent deviation therefrom,'" *United States v. Sabillon-Umana*, 772 F.3d 1328, 1334 n.1 (10th Cir. 2014) (quoting *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996)), it was incumbent upon the *Zavalza-Rodriguez* panel to explain why the dimensions of the safety-valve provision that it outlined were congruent with our earlier decision in *Hallum*.  In other words, we recognized that *Hallum* was the law of this circuit.  And, rather than purporting to overrule any portion of it, as we did in *Pena-Sarabia*, 297 F.3d at 989 & n.2, the *Zavalza-Rodriguez* panel endeavored—as principles of *stare decisis* dictated—to harmonize its articulation of the safety-valve's dimensions with *Hallum*'s holding that a firearm's proximity and potential to facilitate the offense may be determinative.  Given that this harmonization endeavor was a necessary step in establishing the legitimacy and integrity of *Zavalza-Rodriguez*'s holding, we are entirely unpersuaded by Mr. Hargrove's assertion that *Zavalza-Rodriguez*'s discussion of *Hallum* amounted to no more than non-binding dicta.  *See* Aplt.'s Opening Br. at 15 n.5 (contending that in *Zavalza-Rodriguez* "the Court did not need to consider—and did not consider—whether its opinion had an impact on *Hallum*, and its discussion of *Hallum* is nothing more than dicta").  *Compare* Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 STAN. L. REV. 953, 953 (2005) ("A holding consists of those *propositions along the chosen decisional path or paths of reasoning that are actually decided*, are based upon the facts of the case, and *lead to the judgment*. A proposition in a case that is not holding is dicta." (emphasis added)), *with Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir. 1995) ("Dicta are 'statements and comments in an opinion concerning some rule of law or legal proposition *not necessarily involved nor essential to*

(continued...)

In other words, in the parlance of *Zavalza-Rodriguez*, in those circumstances a court may find that a defendant "actively possessed" the firearm. 379 F.3d at 1188. This makes sense. Where a defendant's actual possession is undisputed, the sentencing court may find—by focusing on the defendant's own conduct—the close connection that active possession requires between the defendant and the firearm. As *Zavalza-Rodriguez* suggests, in a scenario of constructive possession, ordinarily more would be required to establish such a close connection. *Compare id.* at 1186 (noting that "we focus on the defendant's own conduct for purposes of evaluating eligibility for the safety valve, and that we recognize a distinction between constructive and actual possession"), *with Andrade-Vargas*, 459 F. App'x at 764, 768 (declaring "mistaken" the notion that *Zavalza-Rodrigruez* held that "one must have actual physical possession of the firearm to make him ineligible for a safety valve reduction" and ruling in a circumstance where the defendant argued that "no evidence showed anyone saw him possessing a firearm" that constructive possession was sufficient to establish the active possession that *Zavalza-Rodriguez* requires, where the defendant had "knowledge and control of the firearms found in the bedroom he rented and had exclusive control over"). And, once the close connection between the defendant and the firearm is established, proof that the firearm was in close proximity to the

_____

[13](...continued)
*determination of the case in hand.*'" (emphasis added) (quoting *Dicta*, BLACK'S LAW DICTIONARY (6th ed. 1990)).

47

offense and had the potential to facilitate the offense would round out the features of *Zavalza-Rodriguez*'s "active possession" requirement by demonstrating the close connection between the firearm and the offense. *See United States v. Payton*, 405 F.3d 1168, 1171 (10th Cir. 2005) (noting, where defendant actually possessed the firearms, that "[t]he mere propinquity of the weapons and drugs suggests a connection between the two").

In sum, our cases teach that a firearm is used "in connection with an offense" when it facilitates or has the "potential to facilitate" that offense. *Hallum*, 103 F.3d at 89. The focus of our inquiry is "the defendant's *own conduct* for purposes of evaluating eligibility for the safety valve." *Zavalza-Rodriguez*, 379 F.3d at 1186 (emphasis added). And the kind of firearms possession that bars application of the safety valve is "active possession whereby there is a close connection linking the individual defendant, the weapon and the offense." *Id.* at 1187. Lastly, in circumstances where the defendant's own conduct evinces actual possession of the firearm, we have recognized that active possession may be shown by evidence of "[that] firearm's proximity and potential to facilitate the offense." *Hallum*, 103 F.3d at 89; *see Zavalza-Rodriguez*, 379 F.3d at 1186 n.2.

**4**

As noted, Mr. Hargrove contends that the district court "erred by considering only Mr. Hargrove's possession of the firearms and their and his proximity to the marijuana, without taking into consideration Mr. Hargrove's own

48

conduct—a consideration required by this Court's authorities." Aplt.'s Opening Br. at 7. However, under the legal principles discussed above, Mr. Hargrove's argument cannot prevail.

**a**

In *Zavalza-Rodriguez*, we expressly acknowledged that when a defendant concedes actual possession of a firearm (as opposed to mere constructive possession), the requirement of active possession—based on defendant's own conduct—may be rounded out and completed by further evidence that the possessed firearm was in close proximity to the offense and had the potential to facilitate it. *See* 379 F.3d at 1186 n.2. Accordingly, contrary to Mr. Hargrove's assertion, on these facts—where Mr. Hargrove freely admitted that the firearms belonged to him and indicated that he had brought them in the vehicle to the scene of his arrest—the district court's express focus on the firearms' proximity and potential to facilitate the offense did not reflect an analytical disregard of Mr. Hargrove's own conduct.

Indeed, Mr. Hargrove's admissions regarding possession of the firearms placed his own conduct front and center, and they were the jumping-off point for the court's further inquiries into proximity and facilitation. In other words, by focusing on Mr. Hargrove's admissions regarding his own conduct, the court could discern that Mr. Hargrove actually possessed the firearms at some point during the trip—at least likely so at the trip's beginning, when the firearms were

placed in the vehicle—and had the firearms in close proximity to him thereafter, including at the time of his arrest. These admissions were sufficient to establish the close connection required for active possession between Mr. Hargrove and the firearms. At that point, the court was left with the task of determining whether the requisite close connection existed between the firearms and the offense, so as to establish active possession. As *Zavalza-Rodriguez* acknowledged, this close connection—under circumstances such as these—could be established where the firearm was in close proximity to and had the potential to facilitate the offense. *See* 379 F.3d at 1186 n.2.

And that was certainly true here. As noted, the district court specifically found (1) that the firearms were located "in the cab of the pickup truck with Defendant and the marijuana," and thus were in close proximity to the drug trafficking, and (2) that the firearms—which were loaded—"had the potential" to facilitate the drug trafficking, even if the firearms did not do so directly. R., Vol. I, at 24. There is ample evidence in the record to support these factual findings. And it is well established that firearms are "'tools of the trade'—that is, means for the distribution of illegal drugs." *United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991) (quoting *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976)); *accord United States v. McGehee*, 672 F.3d 860, 872 (10th Cir. 2012); *see also United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008) (noting that "evidence of Defendant's firearm possession would have been admissible to prove

his intent to distribute marijuana"). Firearms are used by drug traffickers (among other things) to protect themselves from other criminals and to safeguard their valuable narcotics from theft. *See, e.g.*, *United States v. Lott*, 310 F.3d 1231, 1248 (10th Cir. 2002) ("We conclude that the placement of a loaded, semi-automatic weapon on the driver's seat of the car in which the instrumentalities of methamphetamine manufacturing were also found is sufficient evidence from which a jury could conclude that the purpose of the gun was to provide defense or deterrence in furtherance of attempting to manufacture methamphetamine."); *see also United States v. King*, 632 F.3d 646, 657 (10th Cir. 2011) ("Because the loaded rifle in this case was located immediately adjacent to the drugs, a reasonable jury could infer that it furthered [the defendant's] drug trade by protecting [the defendant] and his merchandise."). Thus, Mr. Hargrove's loaded guns certainly had the potential to fulfill this protective purpose and, as the district court specifically ruled, they had the potential to facilitate the drug-trafficking offense.

To be sure, Mr. Hargrove has argued that his possession of the firearms was unrelated to the drug-trafficking activity. In this regard, before the district court, he asserted "that he had no knowledge of the marijuana, he was in the area to fish, and he thought the bundles of marijuana were alfalfa." R., Vol. I, at 22. However, the court effectively discounted these statements in determining that "[t]he presence of the firearms was not coincidental or entirely unrelated to the

drug transaction." *Id.* at 24.[14]  And nothing in this record gives us pause in according this factual determination the customary measure of deference. *See, e.g.*, *Hooks*, 551 F.3d at 1217.

Mr. Hargrove repeatedly objects that the district court did not take into account that there was "no evidence that Mr. Hargrove had ever been involved in any sort of drug distribution," Aplt.'s Reply Br. at 14 n.4, and "did not find that Mr. Hargrove actually used or attempted to use the firearms in any way," Aplt.'s Opening Br. at 10.  *See* Aplt.'s Opening Br. at 21 (noting that "Mr. Hargrove has no criminal history relating to the distribution of drugs or the use of firearms, let alone at the same time"); Aplt.'s Reply Br. at 17 ("There must be something more in the way of the defendant's own conduct (such as evidence the defendant had been running a drug operation or evidence that the defendant planned to use the weapon against human beings) that establishes the weapons were connected to the offense.").  However, Mr. Hargrove cites no Tenth Circuit authority holding that a defendant's prior drug-trafficking activities or actual use of the firearm are necessary to establish active possession—much less that such factors are

---

[14]    Panels of this court have frequently declined to credit self-serving statements about the purpose of a defendant's firearm possession. *See, e.g.*, *Andrade-Vargas*, 459 F. App'x at 768 ("[I]t is evident that, in denying the reduction, the district court discredited Mr. Andrade-Vargas's seemingly self-serving claims he did not own the handguns and that they were not in the room for the purpose of facilitating his drug trafficking activities—both of which were unsupported by any evidence."); *Gutierrez-Casillas*, 140 F. App'x at 28 (affirming district court's decision to "discount[]" each defendant's credibility "by self-interest" (quoting record)).

52

determinative.[15]  In particular, there is nothing in *Zavalza-Rodriguez* that supports such a proposition.  In fact, we have binding Tenth Circuit authority to the contrary—that is, where neither prior drug-trafficking activity nor actual use of the firearm appeared to play any role in our denial of safety-valve relief.  *See Hallum*, 103 F.3d at 89.

In sum, based on the foregoing, we reject Mr. Hargrove's argument that the district court failed to properly focus on his own conduct and, thus, did not correctly determine his eligibility for safety-valve relief.  In our view, the district court's ruling is sound and consistent with our caselaw.

**b**

A closer inspection of our precedential *Hallum* decision only serves to underscore the correctness of our judgment.  Indeed, even standing alone, *Hallum*—which involved materially similar facts—would arguably be determinative.  In *Hallum*, officers apprehended Mr. Hallum and two accomplices who were carrying duffle bags full of marijuana from a marijuana patch to their vehicles, which were parked "200 to 300 yards" away from the patch.  103 F.3d at 89.  After searching the vehicles, the officers found a .22 caliber rifle, which Mr.

---

[15]  Mr. Hargrove relatedly asserts that "the precedential authority requires some *affirmative* action on the part of a defendant to establish that a weapon was possessed 'in connection with the offense.'"  Aplt.'s Reply Br. at 11 (emphasis added).  But Mr. Hargrove cites no precedential authority to support this assertion, merely directing us to the plain text of § 5C1.2(a)(2), which is unavailing.

Hallum later conceded was his. Mr. Hallum testified that he brought the rifle "to shoot snakes, and that while he could have used it to protect against another person he did not have that intention and 'would have not wanted to.'" *Id.* (quoting record). "The district court rejected the essence of Hallum's testimony, declaring that if defendants were afraid of and protecting against snakes they would not have left the rifle in the vehicle some 200 yards from the marijuana patch." *Id.* The district court further found that "the weapon was close to the marijuana cultivation activity, and accessible." *Id.* (quoting record).

We affirmed the district court's denial of Mr. Hallum's safety-valve request. We deemed it significant that Mr. Hallum admitted that he had the gun "for protection." *Id.* (quoting record). "This plus the district court's other findings . . . establish[ed] proximity of the firearm to the offense." *Id.* And, on these facts, we held that "a firearm's proximity and potential to facilitate the offense is enough to prevent application of [U.S.S.G.] § 5C1.2(2)." *Id.* Notably, viewed through the prism crafted by our subsequent decision in *Zavalza-Rodriguez*, all of the elements of the requisite active possession were present in *Hallum*: Mr. Hallum conceded his actual possession of the firearm, establishing a close connection between him and the weapon, and the proximity of the firearm to the marijuana and the evident drug-trafficking activity of Mr. Hallum established the close connection between the weapon and the offense. *See Zavalza-Rodriguez*, 379 F.3d at 1187. And Mr. Hallum acknowledged that the weapon

54

could have been used as protection against other human beings, meaning that it had the potential to facilitate his drug trafficking. Thus, the district court's denial of safety-valve relief should come as no surprise.

Nor should a similar outcome surprise us here. Indeed, *Hallum* virtually commands it.[16] We begin with proximity. The officers apprehended Mr. Hargrove in a rural area with almost 300 pounds of marijuana in his pickup truck. "A [loaded] semi-automatic pistol . . . was on the dashboard and a loaded rifle was behind the seat." R., Vol. I, at 21. The district court specifically noted that "[t]he firearms were located in the cab of the pickup truck with Defendant and the marijuana." *Id.* at 24. The firearms here were thus even closer to Mr. Hargrove and the illegal narcotics than the firearm in *Hallum* was to Mr. Hallum.

---

[16] As we previously mentioned, *Hallum* was overruled in part by an en banc footnote in *Pena-Sarabia*, 297 F.3d at 989 & n.2. In the overruled portion of *Hallum*, we erroneously applied the principle that "participants in joint criminal enterprises can be accountable for the foreseeable acts of others that further the joint activity," in concluding that Mr. Hallum's co-conspirators, like Mr. Hallum, did not qualify for safety-valve relief simply because they "knew of the presence of the weapon Hallum brought to the marijuana patch; [and] that it might further their joint activity was reasonably foreseeable." *Hallum*, 103 F.3d at 90. But, importantly, the court's holding and analysis with respect to Mr. Hallum, which we explicate in text here, has maintained its vitality. *See also Andrade-Vargas*, 459 F. App'x at 767 (noting that "we have continued to rely on our holding in *Hallum* that a firearm's proximity and potential to facilitate the offense may be sufficient to prevent application of the safety valve provision"); *United States v. Montgomery*, 387 F. App'x 884, 888 (10th Cir. 2010) (unpublished) (relying on *Hallum*); *United States v. McClure*, 358 F. App'x 5, 12 (10th Cir. 2009) (unpublished) (same); *United States v. Gonzalez-Ambriz*, 353 F. App'x 155, 157 (10th Cir. 2009) (unpublished) (same); *Archuleta*, 257 F. App'x at 123 (same).

Further, like Mr. Hallum, Mr. Hargrove "voluntarily informed the agents of the presence of the firearms when he was seized." *Id.* at 21. Mr. Hargrove told the agents that he had "two weapons inside the vehicle," the rifle and the pistol. *Id.*, Vol. III, at 263. In post-arrest statements, Mr. Hargrove "admitted the loaded rifle and pistol found in his truck belonged to him." *Id.*, Vol. II, ¶ 8, at 5.[17] And, as in *Hallum*, these admissions supported a finding that Mr. Hargrove actually possessed the firearms at some point during the trip and had them in close proximity to him.

Finally, as in *Hallum*, Mr. Hargrove also ostensibly had the guns for protection against snakes but the district court effectively discredited that exculpatory explanation in denying him safety-valve relief. Mr. Hargrove asserts, however, that *Hallum* is not "directly analogous" to this case because, even though Mr. Hallum testified regarding having the firearm for protection against snakes, the *Hallum* panel elided the snake explanation and determined that he "had his gun 'for protection' *in general*, which necessarily implies that it could be for 'protection' from anything, including human beings." Aplt.'s Reply Br. at 12. The situation here, as Mr. Hargrove reasons, is different; specifically, the

---

[17] Indeed, in his opening statement, Mr. Hargrove's counsel told the jury that Mr. Hargrove and Ms. Richter "have a lot of things in their truck," including "a .25 caliber tiny little pistol" and the rifle that Mr. Hargrove "drives around with." R., Vol. III, at 204. And, during a bench conference with the judge, Mr. Hargrove's counsel plainly admitted that Mr. Hargrove "claimed ownership of the gun. . . . [H]e claimed ownership about it." *Id.* at 278.

56

evidence indicated that he had the firearms *only* as protection against snakes.

This line of argument is strained and unpersuasive. It is not remarkable that the *Hallum* panel spoke generally of Mr. Hallum having the firearms "for protection," without any reference to the snakes justification, because the panel had credited the district court's finding that Mr. Hallum's snake story was incredible. 103 F.3d at 89 (noting the district court's statement that "if defendants were afraid of and protecting against snakes they would not have left the rifle in the vehicle some 200 yards from the marijuana patch"). As such, Mr. Hargrove actually is on precisely the same footing as Mr. Hallum because the district court here also effectively found incredible Mr. Hargrove's exculpatory statements about having the guns for protection against snakes, noting specifically that "[t]he presence of firearms was not coincidental or entirely unrelated to the drug transaction." R., Vol. I, at 24. By merely reiterating statements "not found to be credible" by the district court, Mr. Hargrove is effectively asking "us for a de novo determination of credibility. [However, that] is not our role." *Payton*, 405 F.3d at 1171; *see Galvon-Manzo*, 642 F.3d at 1270–71; *Hooks*, 551 F.3d at 1217.

In sum, *Hallum* cogently underscores the correctness of our decision to uphold the district court's denial of safety-valve relief to Mr. Hargrove. Indeed, given the similarity of *Hallum*'s facts to the instant case, it is arguably determinative.

\*\*\*

In sum, we conclude that the district court did not err in determining that Mr. Hargrove did not establish a basis for safety-valve relief under U.S.S.G. § 5C1.2.

### III

Based on the foregoing, we **AFFIRM** the district court's judgment regarding Mr. Hargrove's conviction and sentence.